**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **CATAHAMA, LLC** | ) |
| *as assignee of FRESH HARVEST RIVER LLC* , | ) |
| **Plaintiff,** | ) |
| | ) **2:10-cv-1140** |
| **v** | ) |
| | ) |
| **FIRST COMMONWEALTH BANK, KERRY** | ) |
| **INC. and THE KERRY GROUP pLC** | ) |
| **Defendants.** | ) |
| | ) |

## <u>MEMORANDUM OPINION AND ORDER OF COURT</u>

Now pending before the Court are the MOTION TO DISMISS FIRST AMENDED

COMPLAINT (Document No. 60) filed by Defendant First Commonwealth Bank (the "Bank");

and KERRY INC. AND THE KERRY GROUP PLC'S MOTION TO DISMISS THE FIRST

AMENDED COMPLAINT (Document No. 62) (collectively "Kerry").  Plaintiff Catahama, LLC

("Catahama") has filed responses in opposition to the motions and they have been thoroughly

briefed (Document Nos. 61, 63, 69, 73, 74, 75, 77).  In addition, the Bank and Kerry have

submitted numerous exhibits in support of their respective motions.  Plaintiff has filed a

Declaration which confirms this Court's diversity jurisdiction.[1]  The motions are now ripe for

disposition.


<u>Factual and Procedural History</u>

This case arises out of a failed business venture.  As set forth in the Amended Complaint,

in the summer of 2008, the Bank foreclosed on its security interest in a state-of-the-art food

---

[1] Although the caption of the Amended Complaint refers to "The Kerry Group LLC," the parties appear to agree that this reference was inadvertent and the correct entity is "The Kerry Group plc."

1

manufacturing facility and equipment located in Dubois, Pennsylvania (the "Facility") and thereby obtained title. To preserve the value of its collateral, the Bank preferred to keep the Facility occupied and operating. Jack Gray, Paul Grillo and Edward Abramson formed Fresh Harvest River, LLC ("FHR") for the purpose of acquiring the Facility. In March 2009, after extensive negotiations, the Bank and FHR reached an agreement. The Bank financed the transaction for FHR through a mortgage loan and two lines of credit so that FHR could make capital improvements and obtain working capital. On April 1, 2009, the parties entered into a series of agreements, including a temporary lease.

On June 22, 2009, the Bank delivered two commitment letters to FHR, confirming its approval of a $7,500,000 Commercial Mortgage/Term Loan for the purchase of the premises, a $3,000,000 Revolving Line of Credit and a $3,000,000 Non-Revolving Line of Credit. The commitment letters required the loans to close on or before June 30, 2009.

The closing of the credit lines occurred on June 23, 2009. However, FHR learned that certain systems had not been installed by the former owner and that the equipment had not been properly maintained. Accordingly, the parties needed to adjust the terms of the deal. While negotiations continued, FHR continued to possess and operate the Facility through amendments to the lease. In August 2009, the parties executed a series of agreements, including an Agreement of Sale for $26,000,000; a $7,500,000 Mortgage loan for the land and building (including a $1,350,000 reduction in the purchase price); a mortgage on the real property; an escrow agreement; and another amendment to the term lease (the "Second Amended Lease") which extended FHR's tenancy until October 30, 2009 – the closing date for the transaction.

At the closing, FHR was required to make a $2,500,000 down payment. Abramson, who was to supply the money, experienced complications with his already-poor health, and advised

Gray and Grillo that he was unwilling to contribute the $2,500,000. This problem coincided with an unforeseen and historic economic downturn that devastated the real estate market, consumer food demand and FHR's business prospects. FHR advised the Bank of these developments, and of its plan to locate additional investors. The parties agreed to adjourn the closing of the Agreement of Sale without date.

Plaintiff alleges that, as evidenced by their conduct, the parties agreed to restructure the terms of the transaction. For example, Plaintiff alleges that the Bank acquiesced to delays in payments due under the credit lines and permitted FHR to remain in possession of the Facility. FHR continued to borrow additional funds from the Bank to improve the Facility, purchase additional equipment, and fund its operations. During late 2009 and early 2010, there were several meetings between FHR, the Bank and potential investors, but none came to fruition. By January 2010, FHR had borrowed $3,000,000 under the Non-Revolving Line of Credit and had reached the maximum credit available under the Revolving Line of Credit. The Bank advised FHR that it was unwilling to loan additional funds under the credit lines.

In February 2010, FHR identified Catahama as a potential investor. Plaintiff alleges that Catahama was willing to provide working capital and to fund customer orders, conditioned on obtaining: (1) a first lien collateral security position in ingredients, inventory, work in progress and receivables created from the financing of those customer orders; and (2) FHR's assignment of accounts receivable to Catahama, through a direction on FHR's invoices that the customer remit payment directly to Catahama. Plaintiff alleges that in February 2010, "the Bank agreed to permit FHR to borrow the additional funds from Catahama under the conditions required by Catahama." Amended Complaint Paragraph 36. Plaintiff does not provide any further details regarding this alleged agreement between the Bank and FHR and it was apparently not

memorialized in writing. There are no averments regarding direct discussions between the Bank and Catahama or the negotiation of a lien subordination agreement between those entities. Subsequently, FHR borrowed $2,162,375.15 from Catahama.

In March 2010, Kerry contacted FHR to explore a co-packing arrangement. FHR and Kerry entered into a Mutual Confidential Information Agreement ("MCIA") on March 5, 2010. Kerry personnel then visited the Facility and obtained information about FHR's business. Kerry was impressed and pledged orders for 8,000,000 cases of product per year. Kerry also developed an interest in purchasing the Facility. On April 8, 2010, FHR and Kerry entered into a Letter of Intent ("LOI") by which Kerry would acquire the Facility from FHR for $22,000,000, "subject to due diligence and other conditions." Amended Complaint Paragraph 44.

In late April 2010, FHR asked the Bank to state the amount it would accept to sell the Facility and Equipment and pay off the Lines of Credit. The Bank responded that a payment of $18,600,000 would be necessary and that it would modify the agreements accordingly. However, the Bank was unwilling to release Abramson from his personal guarantee. In a letter dated April 27, 2010, FHR notified the Bank that it had identified a new equity source (presumably Kerry) and was able to close the transaction.

Plaintiff alleges that to avoid the Bank's problems with Abramson, a bank executive (Hepler) and the Bank's attorney (McGrath) approached Grillo and Gray with a plan to terminate the Agreement of Sale and to consummate the transaction through a new entity. On May 6, 2010, the Bank sent FHR "formal notice" that it had elected to terminate the Agreement of Sale (the "May 6 Termination Letter"). Plaintiff alleges that the May 6 Termination Letter was in connection with the Bank's plan to restructure the transaction. The May 6 Termination Letter also stated that the Bank was terminating the lease, even though the lease had expired on October

30, 2009 and FHR had remained in possession of the Facility thereafter without a lease or payment of rent. Plaintiff further alleges that the Bank continued to negotiate modifications to the financial terms of an agreement with FHR, did not seek possession of the Facility, and did not seek to exercise its rights as a secured creditor. Negotiations between the Bank and FHR continued through early July 2010.

Plaintiff alleges that in mid-May 2010, after entering into the LOI with FHR, Kerry entered into separate, direct negotiations with the Bank to purchase the Facility. Plaintiff alleges that during these negotiations, Kerry misused confidential and proprietary information it had obtained from FHR. Plaintiff further alleges that the Bank decided to use the purported defaults set forth in the May 6 Termination Letter to extricate itself from its contractual obligations to FHR. On May 18, 2010, the Bank sent another letter to FHR to accelerate its Revolving Line of Credit, based upon FHR's failure to cure the alleged defaults set forth in the May 6 Termination Letter.

On July 2, 2010, the Bank entered into an agreement to sell the Facility to Kerry for $20,000,000.[2] On July 6, 2010, the Bank advised FHR of this agreement and demanded that FHR quit the premises as of July 26, 2010. On July 29, 2010, the Bank sent letters to FHR customers, seeking to divert payment from Catahama to the Bank.

On July 20, 2010, FHR filed a lawsuit (the "Federal Case") against the Bank in the United States District Court for the Southern District of New York (Case No. 10-civ-5483) to seek a declaration of rights and specific enforcement of the Agreement of Sale.[3] On July 26, 2010, the Bank filed three separate actions against FHR in the Court of Common Pleas of Clearfield County, Pennsylvania based upon the "confession of judgment" provisions in the

_____

[2] Ultimately, Kerry terminated the agreement pursuant to a letter dated September 7, 2010.
[3] Catahama filed a related case against the Bank, Case No. 10-civ-8316, which has also been transferred to this Court.

Second Amended Lease and credit lines (the "Confession of Judgment Cases"). FHR filed an emergency petition seeking to stay these cases. On September 3, 2010, the Honorable Paul E. Cherry entered an Opinion and Order which denied FHR's petition. FHR filed an appeal, which is currently pending in the Pennsylvania Superior Court.

Defendants contend that Judge Cherry's Opinion and Order is dispositive of this case. In summary, Judge Cherry concluded that the Confession of Judgment Cases should not be dismissed or stayed pursuant to the *lis pendens* doctrine due to the prior filing of the Federal Case. Judge Cherry then determined that FHR had failed to state a prima facie meritorious defense. In reaching this determination, Judge Cherry analyzed the effect of the contracts entered into by the Bank and FHR, including the Agreement of Sale and leases. The Court concluded that the Agreement of Sale had not been modified in writing; that the October 30, 2009 Closing had not occurred; that FHR never made the $2,500,000 payment required under the Agreement; and therefore, that § 20 of the Agreement of Sale (Default by Buyer) remained in full force and effect. The Court further noted that any purported oral modification of the Agreement of Sale (for example, to postpone the closing date and/or the alleged May 2010 plan to restructure the deal) would be unenforceable due to the Statute of Frauds, 33 P.S. § 1; 13 Pa.C.S.A. § 2201. Judge Cherry held that the Bank properly and effectively terminated the Agreement by written notice pursuant to the May 6 Termination Letter. The Court also found that FHR was bound by the terms of the Second Amended Lease; that the Bank properly treated FHR as a holdover tenant; and that FHR was subject to the "confession of judgment" provisions in the lease. Judge Cherry further ruled that a subsequent payment on behalf of FHR in an effort to cure its default did not estop the Bank from moving forward with eviction.

On September 12, 2010, FHR filed for bankruptcy protection under Chapter 11. On November 5, 2010, the United States Bankruptcy Court for the Southern District of New York entered an Order which dismissed the bankruptcy case on the ground that there was no likelihood of a successful reorganization by FHR. The Bankruptcy Court rejected FHR's attempt to enforce its rights under the Agreement of Sale and noted: "there is already a binding determination on the status of the Debtor's occupancy on the property." On November 10, 2010, the Bank executed its Writ of Possession and ejected FHR from the Facility.

On August 30, 2010, the Federal Case was transferred to this Court. In December 2010, Defendants filed motions to dismiss the Complaint. On January 14, 2011, Catahama filed an Amended Complaint, as assignee of FHR. Defendants subsequently filed the pending motions to dismiss the Amended Complaint in its entirety.

Standard of Review

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) is a challenge to the legal sufficiency of the Complaint filed by Plaintiff. The United States Supreme Court has held that "[a] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (*citing Papasan v. Allain*, 478 U.S. 265, 286 (1986)) (alterations in original).

The Court must accept as true all well-pleaded facts and allegations, and must draw all reasonable inferences therefrom in favor of the plaintiff. However, as the Supreme Court made clear in *Twombly,* the "factual allegations must be enough to raise a right to relief above the speculative level." *Id.* The Supreme Court has subsequently broadened the scope of this

requirement, stating that "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Ashcroft v. Iqbal*, -- U.S. --, 129 S. Ct. 1937, 1950 (2009).

However, nothing in *Twombly* or *Iqbal* has changed the other pleading standards for a motion to dismiss pursuant to Rule 12(b)(6). That is, the Supreme Court did not impose a new, heightened pleading requirement, but reaffirmed that Federal Rule of Civil Procedure 8 requires only a short, plain statement of the claim showing that the pleader is entitled to relief, not "detailed factual allegations." *See Phillips v. Co. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008) (*citing Twombly*, 550 U.S. at 552-53). Additionally, the Supreme Court did not abolish the Rule 12(b)(6) requirement that "the facts alleged must be taken as true and a complaint may not be dismissed merely because it appears unlikely that the plaintiff can prove those facts or will ultimately prevail on the merits." *Id.* (*citing Twombly*, 550 U.S. at 553). As described in *Fowler v. UPMC Shadyside*, 578 F.3d 203, 206 (3d Cir. 2009), the Court must first distinguish between factual allegations and legal conclusions in the complaint and then determine whether the well-pleaded factual allegations and favorable inferences drawn therefrom show an entitlement to relief.

Legal Analysis

This case arises from a unique and complex factual and procedural background. FHR, the central actor in the underlying saga, is no longer a party. FHR's extensive efforts throughout 2009 and early 2010 to purchase the Facility from the Bank failed for a variety of reasons, including FHR's inability to pay the $2,500,000 down payment. FHR identified Catahama (now the Plaintiff) as a "white knight" investor in February 2010. FHR identified Kerry as a potential customer in early 2010 and the relationship then expanded. On December 16, 2010 FHR

assigned its legal claims against the Bank and Kerry to Catahama. There are no averments in the Amended Complaint as to any direct interactions between Catahama and either the Bank or Kerry.

As of April 2010, FHR had allegedly negotiated two separate deals: it would (at long last) buy the Facility from the Bank and then immediately sell the Facility to Kerry. Apparently, Kerry discovered that FHR did not own the Facility and then attempted to "cut out the middle man" by negotiating directly with the Bank.

The Court must resolve several preliminary issues before addressing the merits of the parties' competing positions on the various claims set forth in the Amended Complaint.


1. Consideration of Documents Outside the Pleadings

As an initial matter, the Court must determine whether it may consider the numerous exhibits submitted by Defendants. The Amended Complaint references the Agreement for the Sale of Real Estate, the Lease, Amendment to Lease and Second Amendment to Lease documents, the May 6 Termination Letter, and the July 29, 2010 letters sent by the Bank to FHR's customers. Similarly, the Amended Complaint references the MCIA and LOI between FHR and Kerry and Kerry's Notice of Termination of the LOI dated May 27, 2010. The authenticity of these documents has not been disputed. Therefore, the documents will be considered in ruling on the motion to dismiss. *See Pension Benefit Guar. Corp. v. White Consol. Industries, Inc*., 998 F.2d 1192, 1196 (3d Cir. 1993). In addition, the Court will take judicial notice of: (1) the Opinion and Order issued by Judge Paul E. Cherry of the Court of Common Pleas of Clearfield County, Pennsylvania on September 3, 2010; and (2) the Order Dismissing the Case issued by Chief United States Bankruptcy Judge Arthur J. Gonzalez of the United States

Bankruptcy Court for the Southern District of New York on November 5, 2010. *See McTernan v. City of York*, 577 F.3d 521, 526 (3d Cir. 2009).

    2.  The "Contested Claims"

Counts I, II and V of the Amended Complaint (the "Contested Claims") assert claims based on the Agreement of Sale between the Bank and FHR. The Agreement of Sale § 23(h)(i) provides that FHR may not assign its rights under the Agreement without the Bank's prior written consent and no such written consent has been pled. Plaintiff has represented to the Court that, after reviewing the Bank's motion to dismiss, it intends to voluntarily dismiss the Contested Claims without prejudice pending resolution of the appeal from Judge Cherry's Order.

The Bank objects to such voluntary dismissal and asks the Court to dismiss the Contested Claims with prejudice and to impose sanctions on Catahama. The Bank argues that the Contested Claims were re-asserted in the Amended Complaint for an improper purpose (namely, to prevent the Bank from selling the Facility) and that it has been clear that the Contested Claims are precluded by Judge Cherry's Opinion since the filing of the Bank's motion to dismiss the original Complaint. Plaintiff denies that it has presented the Contested Claims for any improper purpose.

The Court concludes that sanctions are not warranted, as Plaintiff has articulated a good faith rationale for asserting the Contested Claims. On the other hand, as the case currently stands, the Contested Claims are ripe for disposition by the Court. As Catahama acknowledges, the Contested Claims "depend upon FHR's contract rights which FHR did not assign to Catahama." Therefore, Catahama lacks standing to assert the Contested Claims in this Court

even if the state court appeal is successful.[4]  Accordingly, the Court concludes that Counts I, II and V of the Amended Complaint will be **DISMISSED WITH PREJUDICE**.


3.  Tortious Interference Claim Against the Bank

Count III of the Amended Complaint asserts a claim for tortious interference with existing and prospective contractual relations based on the letters sent by the Bank to FHR customers on July 29, 2010.  The gravamen of Plaintiff's theory is that the Bank knew and consented to the  assignment by FHR to Catahama of first lien priority on payments from FHR customers, in order to induce Catahama to provide financing to keep FHR in operation, and thus, the Bank was without privilege or justification to contact FHR's customers to divert those accounts receivable payments to itself and away from Catahama.  Plaintiff alleges that the Bank's letters caused FHR's customers to stop paying the outstanding amounts due and/or to refuse to continue to do business with FHR, which caused FHR to cease its operations.

To plead a prima facie case for tortious interference with contract under Pennsylvania law, Plaintiff must allege:  (1) the existence of a contractual (or prospective contractual) relation between the complainant and a third party; (2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual legal damage as a result of the defendant's conduct.  *Remick v. Manfredy*, 238 F.3d 248, 263 (3d Cir. 2001) (citing *Pelagatti v. Cohen*, 536 A.2d 1337, 1343 (Pa. Super. 1987)).  Under Pennsylvania law, it is Plaintiff's burden, as part of the prima facie case, to show that Defendant acted without justification.  *Triffin v. Janssen*, 626 A.2d 571, 574 n.3 (Pa. Super. 1993) (citations omitted).

---

[4] The Court also concludes that Judge Cherry's Opinion and Order is entitled to preclusive effect.

The Court concludes that the Amended Complaint fails to allege a valid tortious interference claim. There are not sufficient facts to support a plausible claim that the Bank acted "without privilege or justification." Paragraph 103 (which avers that the Bank acted without privilege or justification) merely states a legal conclusion.

The Bank and FHR entered into a Security Agreement by which the Bank obtained a first lien position security interest in the business assets of FHR, as defined in that agreement, which included payments due from FHR customers. Exhibit I contains UCC Financing Statements which reflect that the Bank perfected its security interest by filing with the Secretary of State of New Hampshire. Pursuant to the Security Agreement § 4, upon the occurrence of an event of default, the Bank had the right to "notify the obligor on any of the Collateral, whether Accounts or otherwise, to make payment thereon directly to Secured Party . . . ." *See also* 13 Pa. C.S.A. § 9607(a) (setting forth collection and enforcement rights of a secured party). In paragraph 35 of the Amended Complaint, Plaintiff acknowledges that the Bank held such a security interest.

Plaintiff has attempted to plead around the Bank's security interest. In paragraph 34, Plaintiff alleges that as a condition for providing working capital to FHR, Catahama demanded a first lien position on accounts receivable and demanded that FHR instruct its customers to remit payment directly to Catahama. In paragraph 35, Plaintiff alleges that in February 2010, FHR informed Hepler, a senior officer of the Bank, that Catahama had agreed to provide funding to FHR subject to the Bank's consent to FHR's proposed lending arrangement with Catahama (i.e., that the assignment of receivables would be free and clear of the Bank's security interest.) In paragraph 36, Plaintiff alleges that "the Bank agreed to permit FHR [to] borrow the additional funds from Catahama under the conditions required by Catahama." Similarly, Paragraph 102

alleges that the "Bank also knew of, and consented to, FHR's assignment of accounts receivable to Catahama to induce Catahama to provide financing to FHR . . . ."

The Court concludes that these averments are not sufficient to demonstrate a lack of privilege or justification for the Bank to act on its security interest. The Amended Complaint lacks details as to the February 2010 "consent" FHR allegedly obtained from the Bank. For example, the Amended Complaint fails to plead whether the Bank's alleged consent was oral or written, whether it was supported by valid consideration, whether it was still in effect in late July 2010 (when the Bank sent the letters to FHR's customers), and whether FHR had complied with the terms of the alleged consent agreement.

More importantly, even assuming, arguendo, that the Bank consented to FHR's assignment of FHR's rights to Catahama, there are no facts pled to support a plausible claim that the Bank surrendered the Bank's security rights. FHR's assignment of its (FHR's) customer payments to Catahama could not destroy the Bank's security interest, as FHR could only convey its own rights to those customer payments, which were subordinate to the Bank's security interest. The Amended Complaint does not aver any direct negotiations between the Bank and Catahama, nor the existence of any lien subordination agreement between the Bank and Catahama by which the Bank assigned its (the Bank's) rights to Catahama. The Amended Complaint does not aver that the Bank relinquished its first lien position, nor that Catahama perfected a superior position.

In summary, the Court concludes that Plaintiff has not pled sufficient facts to make it plausible that the Bank acted without privilege or justification in exercising its rights as a secured lender, and therefore, has not stated a prima facie case of tortious interference with contractual relations. Accordingly, Count III will be **DISMISSED**.

13

4. Promissory Estoppel Claim vs. the Bank

In Count IV of the Amended Complaint, Plaintiff alleges that after entering into the Agreement of Sale and related documents in the summer of 2009, the Bank and FHR agreed to restructure their relationship in light of changed economic circumstances. Plaintiff avers that the parties agreed to adjourn the closing date *sine die* (i.e., indefinitely) and "to negotiate in good faith to restructure the terms of the interrelated transactions. . . ." Paragraph 108. Plaintiff further avers that over the next nine months FHR was permitted to remain in possession of the Facility and to make further borrowings from the Bank and other sources and to expend resources to develop its business. Paragraph 110 alleges that the Bank and FHR, in fact, "engaged in ongoing discussions and negotiations for the acquisition of the Premises . . . ."

In *Luther v. Kia Motors America, Inc.,* 676 F.Supp.2d 408 (W.D. Pa. 2009), the Court provided a concise summary of the legal principles which govern promissory estoppel claims:

> To establish a promissory estoppel claim under Pennsylvania law, the plaintiff must show that
>
> 1) the promisor made a promise that he should have reasonably expected to induce action or forbearance on the part of the promisee;
>
> 2) the promisee actually took action or refrained from taking action in reliance on the promise; and
>
> 3) injustice can be avoided only by enforcing the promise.
>
> Promissory estoppel is "an equitable remedy to be implemented only when there is no contract; it is not designed to protect parties who do not adequately memorialize their contracts in writing."
>
> The elements of promissory estoppel are "(1) misleading words, conduct or silence by the party against whom the estoppel is asserted; (2) unambiguous proof of reasonable reliance on the misrepresentation by the party seeking to assert the estoppel; and (3) no duty of inquiry on the party seeking to assert estoppel." These elements must be established by "clear and convincing evidence."

> To succeed on a promissory estoppel claim, the plaintiff must further establish that the action he took "amounted to a substantial change of position." A claim for estoppel cannot survive when the plaintiff's actions were based on "his own will and judgment" rather than the defendant's representations.

*Id*. at 421-422 (citations omitted). The parties appear to agree that Pennsylvania law applies.

In essence, Plaintiff contends that the Bank promised continually to renegotiate based on the original Agreement of Sale and finally agreed on a restructured transaction price in April 2010. The Bank contends that a promise "to negotiate in good faith" is not sufficiently definite to support a promissory estoppel claim and that FHR could not reasonably rely on such a promise.

The Court agrees with the Bank. The facts, as pled in the Amended Complaint, do not support a valid promissory estoppel claim. The Bank's alleged promise to negotiate in good faith is not sufficiently concrete to be enforceable or to induce reasonable reliance on the part of a sophisticated party such as FHR. *See B&P Holdings I, LLC v. Grand Sasso, Inc*., 114 Fed. Appx. 461, 466 (3d Cir. 2004) (non-precential) ("An agreement to negotiate in good faith does not guarantee the ultimate execution of a final contract. There is nothing to indicate that, had the parties negotiated in good faith, a final agreement necessarily would have been reached.") On the face of the Amended Complaint, essential terms (such as timing, price and Abramson's personal liability for the unpaid $2,500,000) remained unresolved for many months. Thus, in continuing to invest in the business FHR assumed the risk that acceptable terms would not be reached. Moreover, the Amended Complaint avers that the Bank did, in fact, engage in extensive and lengthy negotiations with FHR in an effort to reach acceptable terms. The discussion in *GMH Associates, Inc. v. Prudential Realty Group*, 752 A.2d 889, 904-05 (Pa. Super. 2000), is analogous and instructive:

It is clear, in our view, that the negotiations for the sale of the Property did not go as expected by the parties due, in part, to GMH's request for a $3 million reduction in the LOI purchase price and its inability to secure the Allegheny transaction in a timely fashion. We will not conclude that Prudential's "promise" to keep the Property off the market was enforceable in the face of the apparent difficulties the parties encountered in closing the transaction. Since Prudential kept the Property off the market for three months during which time the proposed transaction was not consummated, we do not find the doctrine of promissory estoppel available to bind it to continue to keep the Property off the market seemingly indefinitely.

*See also Josephs v. Pizza Hut of America, Inc.*, 733 F. Supp. 222 (W.D. Pa. 1989) (statement that corporate approval of lease was a "mere formality" was not sufficient to support promissory estoppel claim). Plaintiff's attempt to distinguish these cases based on their procedural status is unavailing because the Amended Complaint fails to allege a sufficiently definite promise by the Bank on which FHR could have reasonably relied. The case on which Plaintiff relies, *Bennett v. Itochu Intl., Inc.*, 682 F.Supp.2d 469, 484 (E.D. Pa. 2010) (promissory estoppel claim survived motion to dismiss), is readily distinguishable because the defendant had promised it would purchase shares of stock on a specific date for a sum certain.

In this case, the Bank permitted FHR to remain in possession of the Facility for over nine months while the parties engaged in extended negotiations. As in *GMH Associates*, the Bank was not required to allow FHR to remain in possession of the Facility indefinitely and a promissory estoppel claim cannot be based on the Bank's alleged breach of a promise to negotiate in good faith. Count IV of the Amended Complaint will be **DISMISSED**.

5. Breach of MCIA Contract Claim Against Kerry

Kerry and FHR executed a MCIA in March 2010 to govern their customer/supplier relationship.[5] In Count VI, Plaintiff alleges that Kerry used the MCIA as a pretext to obtain

_____

[5] The MCIA and LOI provide that they be construed in accordance with Wisconsin law.

extensive information and, as a result, became aware of the strategic value of FHR's business. Plaintiff alleges that instead of using the information solely for its customer/supplier relationship, Kerry exploited the information to the detriment of FHR to make a separate arrangement with the Bank.

Kerry moves for the dismissal of Count VI for several reasons. Kerry contends that Catahama lacks standing to assert this claim due to the "no assignment" clause in the MCIA. Kerry also contends that the Amended Complaint fails to identify any alleged breach of the MCIA, and points out that it never promised not to negotiate with the Bank. Finally, Kerry argues that because it never consummated a transaction with the Bank, FHR was not damaged.

Plaintiff contends that it has stated a valid claim. As an initial matter, Plaintiff explains that the "no assignment" clause in the MCIA is irrelevant because FHR did not assign its rights under the contract, but instead assigned its legal claims. Plaintiff further contends that the Amended Complaint sufficiently alleges misuse by Kerry of FHR's confidential information. Specifically, Plaintiff contends that the information that FHR provided pursuant to the MCIA allowed Kerry to learn of the true potential of the business and that Kerry misused the information to make plans to purchase the Facility from the Bank. Finally, Plaintiff contends that FHR suffered damages through: (1) the disruption of its customer/supplier relationship with Kerry; (2) the frustration of its deal to sell the Facility to the Bank; and (3) FHR's loss of business while the sale between Kerry and the Bank was still pending.

The Court concludes that the Amended Complaint does not sufficiently allege a breach of the MCIA by Kerry, as the allegations of breach are threadbare legal conclusions. In particular, there are no averments as to what confidential information was obtained by Kerry pursuant to the MCIA, how such information was misused or disclosed by Kerry, when, or to whom. The only

specific piece of information referenced in Count VI -- that Kerry "learned that it could make a separate deal with the Bank at a lower price" (Paragraph 128) -- is not connected to a breach of the MCIA. Indeed, the Amended Complaint does not allege that FHR provided Kerry with this information pursuant to the MCIA. Moreover, the MCIA did not preclude Kerry from obtaining information about FHR that was in the "public domain" or otherwise generally available (*see* MCIA § 1(c)), nor from entering into separate negotiations with the Bank. Plaintiff's theory that disclosure of the strategic value of FHR's business led Kerry to initiate separate negotiations with the Bank is inherently implausible, in that Kerry would not have acquired the "strategic value" of FHR's business by purchasing only the assets from the Bank. In summary, the Court concludes that Count VI of the Amended Complaint fails to set forth a plausible claim for breach of the MCIA, and therefore, it will be **DISMISSED**.


6. Breach of LOI Claim Against Kerry

In Count VII of the Amended Complaint, Plaintiff contends that Kerry committed a breach of contract or breached an implied covenant of good faith and fair dealing in connection with the LOI. In essence, Plaintiff contends that Kerry's use of confidential information in its negotiations with the Bank constituted a breach of the confidentiality provisions in Paragraph 6 of the LOI. Plaintiff further contends that Kerry was not entitled to unilaterally terminate the LOI pursuant to Paragraph 7 because the parties were still engaged in negotiations designed to lead to a definitive agreement. Alternatively, Plaintiff contends that Kerry failed to act in good faith to consummate the transaction.

Kerry contends that this cause of action fails as a matter of law because it properly terminated the LOI. Kerry further contends that the good faith "exclusivity" provision in

Paragraph 5 of the LOI is one-sided, and is binding only upon FHR.  More generally, Kerry contends that the Amended Complaint fails to allege sufficient facts to state a valid claim.

The Court is not persuaded by Kerry's citation to Paragraph 5 of the LOI.  Plaintiff has made clear that it is not alleging a breach of the "exclusivity" provision, and therefore, Paragraph 5 is irrelevant.

Kerry's position regarding the termination provision in Paragraph 7 is similarly unavailing.  By its terms, Kerry did not have a unilateral right to terminate the LOI after thirty (30) days.  Rather, termination was conditional – "provided the parties are not then engaged in negotiations designed to lead to such a definitive agreement."  Plaintiff has alleged that the parties were, in fact, engaged in such negotiations.  *See* Paragraph 136.  The Court is aware that Kerry's duty to enter into a final agreement was conditioned upon due diligence, negotiation of a final agreement and a manufacturing agreement, employee retention, regulatory permits and other conditions as set forth in the LOI.  Nevertheless, at this stage of the case, the Court must assume the truth of Plaintiff's allegations that the parties were continuing to negotiate a definitive agreement, and thus, the "wrongful termination" theory cannot be dismissed at this stage of the case.

By contrast, the Court agrees with Kerry that the Amended Complaint does not state a valid claim for breach of the confidentiality provision in Paragraph 6 of the LOI.[6]  Plaintiff's theory is contrary to the actual text of the agreement, which does not contain an expansive duty of confidentiality and does not prevent Kerry from contacting other parties.  Paragraph 6 of the LOI states, in relevant part:  "This Letter of Intent (including the fact of its existence) and the parties' intention to consummate the contemplated transaction shall remain confidential and may

---

[6] To the extent that Plaintiff alleges a misuse of information obtained pursuant to the MCIA, this claim is duplicative of Count VI.

not be disclosed to any person…." The Amended Complaint does not aver that Kerry disclosed the existence of the LOI or that Kerry and FHR intended to consummate a transaction. Instead, Plaintiff appears to be advancing the opposite theory -- that Kerry entered into separate, secret negotiations to purchase the Facility directly from the Bank. In sum, the Amended Complaint fails to allege a plausible breach of the confidentiality provision of the LOI.

Accordingly, the motion to dismiss Count VII will be **GRANTED IN PART** as to breach of Paragraph 6 of the LOI and **DENIED IN PART** as to breach of Paragraph 7 of the LOI.


7. Tortious Interference Claim Against Kerry

In Count VIII, Plaintiff alleges that Kerry tortiously interfered with the Bank's agreement to sell the Facility to FHR. Although the allegations in this count of the Amended Complaint are rather sparse, Plaintiff's theory is that Kerry used information that it obtained through the MCIA and LOI with FHR as a pretext to formulate a deal to acquire the Facility from the Bank. *See* Paragraph 141.

Kerry contends that this claim is barred by the statute of frauds and collateral estoppel, as it has already been determined that the purported contract between the Bank and FHR is unenforceable. Kerry also contends that the allegations are too conclusory. In particular, Defendant argues that Plaintiff has failed to allege that Kerry acted for the specific purpose of causing harm to FHR and has failed to identify the contract that would have been formed but for the alleged interference. Kerry argues that the original Agreement of Sale between the Bank and FHR expired by its terms on October 30, 2009.

Plaintiff contends that it has properly identified a contract and/or prospective contract. The Court agrees. Plaintiff has alleged tortious interference by Kerry prior to May 2010, when the original Agreement of Sale was in effect. In addition, the Amended Complaint Paragraph 53 avers that the Bank and FHR continued to negotiate through early July 2010 to modify the terms of their deal. As Plaintiff points out, Kerry's position that the Agreement of Sale expired in October 2009 is contrary to the position of the Bank that it terminated that agreement by letter dated May 6, 2010. More importantly, Judge Cherry determined that the Agreement of Sale was terminated on May 6, 2010. Opinion at 11. In sum, this element of the claim is well pled.

Plaintiff also contends that it has adequately pled an intent to harm – namely that Kerry intended to interrupt the negotiations between FHR and the Bank by "cutting out the middle man" by negotiating with the Bank directly. In response to Kerry's contention that there were no damages because its deal with the Bank was never consummated, Plaintiff points out that it alleged that Kerry's conduct interrupted its transaction with the Bank from being consummated, which in turn caused its business to be destroyed. The Court agrees that the allegations of the Amended Complaint sufficiently set forth these elements.

Nevertheless, Plaintiff has failed to plead any facts to establish an absence of privilege or justification except for a bare legal conclusion in Paragraph 140. As discussed above, the MCIA and LOI did not expressly prevent Kerry from obtaining other available information or from contacting the Bank – particularly when Kerry learned that the Bank was the rightful owner of the Facility. Thus, the Amended Complaint has not set forth a prima facie case for tortious interference with contract.

Accordingly, the motion to dismiss Count VIII will be **GRANTED**.

<u>Leave to Amend</u>

Plaintiff has requested leave to file a Second Amended Complaint as to Counts III, IV, VI, VII, and VIII. If a complaint is subject to Rule 12(b)(6) dismissal, a district court must permit a curative amendment unless such an amendment would be inequitable or futile. *Alston v. Parker*, 363 F.3d 229, 235 (3d Cir. 2004); *Accord Grayson v. Mayview State Hosp.*, 293 F.3d 103 (3d Cir. 2002). The district court may dismiss the action if the plaintiff does not file an amended complaint within that time, or if the plaintiff files a notice of his intent to stand on the complaint as filed.

The Court will permit Plaintiff to file a Second Amended Complaint as to Counts III, IV, VI, VII, and VIII, albeit with a cautionary note. Defendants have articulated numerous alleged shortcomings with the Amended Complaint and this Memorandum Opinion has outlined the Court's concerns. If Plaintiff chooses to file a Second Amended Complaint, it will be important to assure that it contains sufficient factual allegations to render the claim(s) "plausible" in compliance with the pleading standard set forth in *Twombly* and *Phillips*.

<u>Conclusion</u>

For the reasons set forth above, the MOTION TO DISMISS FIRST AMENDED COMPLAINT (Document No. 60) filed by Defendant First Commonwealth Bank will be **GRANTED** in its entirety and the Bank will be dismissed as a party, subject to Plaintiff's opportunity to amend its complaint. KERRY INC. AND THE KERRY GROUP PLC'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT (Document No. 62) will be **GRANTED IN PART AND DENIED IN PART.** Counts VI and VIII will be dismissed in

their entireties and the motion to dismiss Count VII will be **GRANTED IN PART** as to breach of Paragraph 6 of the LOI and **DENIED IN PART** as to breach of Paragraph 7 of the LOI.

Plaintiff will be granted an opportunity to file a Second Amended Complaint on or before July 8, 2011.  Defendant(s) shall plead thereto on or before July 29, 2011.

If Plaintiff provides notice of its intent to stand on the Amended Complaint as filed, First Commonwealth Bank will be dismissed as a party and the caption will be revised accordingly, and Kerry will be required to file an Answer to the portion of Count VII of the Amended Complaint described above on or before July 29, 2011.

An appropriate Order follows.


McVerry, J.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **CATAHAMA, LLC** | ) |
| *as assignee of FRESH HARVEST RIVER LLC* , | ) |
| **Plaintiff,** | ) |
| | ) **2:10-cv-1140** |
| **v** | ) |
| | ) |
| **FIRST COMMONWEALTH BANK, KERRY** | ) |
| **INC. and THE KERRY GROUP pLC** | ) |
| **Defendants.** | ) |
| | ) |

## ORDER OF COURT

AND NOW, this 24th day of June 2011, in accordance with the foregoing Memorandum Opinion, it is hereby **ORDERED, ADJUDGED and DECREED** that the MOTION TO DISMISS FIRST AMENDED COMPLAINT (Document No. 60) filed by Defendant First Commonwealth Bank is **GRANTED** in its entirety.  KERRY INC. AND THE KERRY GROUP PLC'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT (Document No. 62) is **GRANTED IN PART AND DENIED IN PART as follows:**  the motion to dismiss Counts VI and VIII is **GRANTED**; the motion to dismiss Count VII is **GRANTED IN PART** as to breach of Paragraph 6 of the LOI and **DENIED IN PART** as to breach of Paragraph 7 of the LOI.


On or before July 8, 2011, Plaintiff shall file a Second Amended Complaint or a notice of its intent to stand on the Amended Complaint.


On or before July 29, 2011, Defendant(s) shall file a response to the Second Amended Complaint.

In the alternative, if Plaintiff intends to stand on the Amended Complaint as filed, the Bank will be dismissed as a party, the caption will be modified accordingly, and Kerry shall file an Answer to the remainder of Count VII of the Amended Complaint on or before July 29, 2011.

BY THE COURT:

<u>s/Terrence F. McVerry</u>
United States District Judge

CC:   **Peter H. Schnore, Esquire**
Email: pschnore@bccz.com
**Kevin K. Douglass, Esquire**
Email: kdouglass@bccz.com
**Lita Beth Wright, Esquire**
Email: lbwright@samlegal.com
**Steven G. Storch, Esquire**
Email: storch@samlegal.com
**Jason Levin. Esquire**
Email: jlevin@samlegal.com

**Harry H. Rimm, Esquire**
Email: hrimm@reedsmith.com
**Jarrod Shaw, Esquire**
Email: jshaw@reedsmith.com
**John Henry Doyle , III, Esquire**
Email: jdoyle@reedsmith.com

**Emily M. Emerson, Esquire**
Email: eemerson@mayerbrown.com
**Mark A. Willard, Esquire**
Email: mwillard@eckertseamans.com
**Michael Rowe Feagley, Esquire**
Email: mfeagley@mayerbrown.com