**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

```
----------------------------------------------------------------x
CATAHAMA, LLC, as assignee of FRESH         :
HARVEST RIVER LLC,                          :
                                            :     Civ. No. 2:10-CV-01140 (TFM)
                    Plaintiff,              :
                                            :
         v.                                 :     Honorable Terrence F. McVerry
                                            :
KERRY INC, and the                          :
KERRY GROUP plc,                            :
                                            :
                    Defendant.              :
----------------------------------------------------------------x
```

**DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR
<u>MOTIONS FOR SUMMARY JUDGMENT ON ALL CLAIMS</u>**

This dispute arises from a contemplated real estate transaction between Fresh Harvest River ("FHR") and Defendant Kerry Inc. ("Kerry"), which ultimately failed when Kerry discovered that FHR did not own what it was attempting to sell.  After extensive document production by the parties and First Commonwealth Bank, it is apparent that Plaintiff still does not have, and cannot provide, basic facts and evidence to support its allegations.  Additionally, Plaintiff's complaint purports to assert breach of contract claims against Kerry Group plc ("Kerry Group")—yet Kerry Group is not a party to either of the agreements involved in this dispute.

Plaintiff's Complaint is founded on guesswork, speculation, and conjecture presumably in the hope of later uncovering facts that would allow it to blame the transaction's failure on Kerry.  However, previous orders and findings of this and other courts, the evidence obtained via voluminous document production, and the sworn affidavit testimony of witnesses has instead revealed that in fact, FHR indeed misled Kerry as to its ownership interest in, and right to convey, the property it was attempting to sell, and that upon learning of this, Kerry properly

terminated its letter of intent with FHR.  For the reasons set forth below, Defendants respectfully request that the Court grant summary judgment in favor of both Defendants on all claims.

## I.        STATEMENT OF FACTS

Defendants have filed contemporaneously with their Motions for Summary Judgment and this Memorandum, a Concise Statement of Undisputed Material Facts, sworn affidavits, and exhibits in support of their Motions for Summary Judgment.  Defendants incorporate those facts, affidavits, and exhibits herein as if set forth in full.

The operative facts of this dispute begin prior to Kerry's involvement.  In the fall of 2008, Jack Gray, Paul Grillo, and Edward Abramson formed FHR for the purpose of acquiring the real estate, manufacturing plant, and equipment located at 2592 Oklahoma-Salem Road, Dubois Pennsylvania ("the Premises") from First Commonwealth Bank (the "Bank"), which held title to the Premises.  Defendants' Concise Statement of Undisputed Material Facts ("UMF") at ¶¶ 5–6.  On August 30, 2009, FHR and the Bank executed an agreement for the purchase and sale of the real estate and plant, which FHR later defaulted on when it was unable to close by the deadline contained in the agreement.  UMF at ¶¶ 8–9.  Months later, FHR's attorney sent a letter to the Bank indicating that FHR was still unable to secure financing, but that it hoped to attract an investor and make a new offer to the Bank.  UMF at ¶ 12.Shortly thereafter, the Bank elected to formally terminate the agreement of sale with FHR as a result of FHR's default.  UMF at ¶ 13.

In March 2010, Kerry engaged FHR to co-manufacture products for certain Kerry customers.  UMF at ¶ 14.  Pursuant to this relationship, Kerry requested that FHR sign a "Mutual Confidential Information Agreement" ("MCIA") in order to protect the confidential information of Kerry's customers, which was executed on March 5, 2010.  UMF at ¶ 15.  In late March, Kerry expressed interest in purchasing the Premises from FHR, believing that FHR was the true

owner of the Premises, and began discussions to explore an acquisition.  UMF at ¶ 17.  However, FHR did not disclose to Kerry that it did not own the Premises, that it had no right to convey the Premises, or that it had defaulted on its agreement with the Bank in its previous attempt to purchase the Premises.  *Id.*  Rather, FHR made consistent representations to Kerry that it owned the Premises, ensuring that Kerry's belief in FHR's ownership went undisturbed.  *Id.*  Operating under the belief that FHR owned the Premises, Kerry executed a non-binding "Letter of Intent" ("LOI") with FHR in early April 2010 to guide the negotiation and purchase process.  UMF at ¶ 19.

After executing the LOI, Kerry began its routine due diligence investigation of the Premises, requesting information on April 21 regarding the plant and its facilities, manufacturing and development capabilities, FHR formulations and customers, title to the Premises, and FHR's legal obligations and liabilities.  UMF at ¶ 26.  The Kerry personnel responsible for the acquisition process were separate and distinct from the Kerry personnel involved in the manufacturing relationship with FHR.  UMF at ¶ 24. At no time did the acquisition team request or receive information regarding the Premises obtained as a result of the manufacturing arrangement between Kerry and FHR.  *Id*.  Throughout the due diligence process, FHR continued to represent that it owned the Premises, and failed to correct Kerry's belief of this fact when explicitly asked.  UMF at ¶ 25.  When FHR finally replied to Kerry's due diligence requests nearly one month later, it provided none of the requested information regarding title and FHR's legal obligations and liabilities, which information would have alerted Kerry to the fact that FHR did not own the Premises.  UMF at ¶ 29.

On April 30, 2010, Kerry transmitted a draft purchase agreement to FHR for its review and comment.  UMF at ¶ 27.  Despite multiple inquiries by Kerry, FHR never replied with

comments or edits to the draft agreement, and never responded to Kerry's attempts to engage in substantive negotiation of the transaction terms.  UMF at ¶ 28.

Meanwhile, beginning in early May 2010, Kerry began to receive communications through its broker from an unnamed individual claiming to be a consultant for the Bank.  UMF at ¶ 30.  That consultant relayed that the Bank held title to the Premises, and that FHR had no ownership interest in the Premises whatsoever, and were in fact mere "middle men."  *Id.*  The consultant informed Kerry's broker that the Bank was interested in having a direct conversation with Kerry, an invitation Kerry refused.  *Id.*  Kerry was skeptical of the intentions of the Bank's consultant, and of the veracity of his information, but began to further investigate the ownership of the Premises out of an abundance of caution.  *Id.*

On May 19, 2010, having received no response from FHR with respect to its inquiries as to the ownership of the Premises, Kerry obtained a credit report on FHR which revealed UCC filings reflecting the Bank's security interest in all FHR assets, furthering Kerry's suspicion that all was not as it appeared.  UMF at ¶ 34.  When confronted with these discoveries in a telephone call, FHR represented that it had an ownership interest pursuant to an option to purchase the Premises, and that FHR had the absolute right to convey the Premises to Kerry.  UMF at ¶ 32.  On May 24, 2010, FHR supplemented its due diligence submission to Kerry, again failing to provide the requested title and legal information relating to ownership of the Premises.  UMF at ¶ 33.  Later that same day, FHR's counsel finally transmitted a title commitment to Kerry reflecting that title to the Premises was indeed held by the Bank, and further represented that FHR was operating the Premises under a "lease with an option to purchase."  UMF at ¶ 34.  The alleged "lease with an option to purchase" was never produced.

Seeking final confirmation of its suspicions, Kerry contacted the Bank's counsel for the first time on May 24 and 25, with the sole purpose of confirming that the Bank held title to the Premises.   UMF at ¶ 36.   The Bank's counsel confirmed this to Kerry, and Kerry promptly voided the LOI via telephone on May 26, and sent written confirmation to FHR the next day. *Id.*; UMF at ¶ 37.

After terminating its LOI with FHR upon confirming that FHR did not own the Premises or have the right to sell it, Kerry then entered into negotiations to purchase the Premises from the Bank, the true title-holder.   UMF at ¶ 41.   As part of this new transaction, Kerry once again undertook extensive due diligence efforts, including inspections of the Premises and collection from the Bank of data regarding the plant's equipment and capabilities.   UMF at ¶ 42.   Kerry's valuation of the Premises was based solely on the real estate, plant facility, and equipment therein; FHR's business features and alleged customer relationships were not considered in this process.   UMF at ¶ 43.   While Kerry and the Bank reached a final purchase and sale agreement on June 24, 2010, Kerry ultimately elected to terminate its agreement with the Bank.   UMF at ¶ 44.

On July 19, 2010, FHR initiated this action against Kerry, alleging that Kerry breached its agreements with FHR.   Later in July, the Bank brought an action to eject FHR from the Premises in the Court of Common Pleas of Clearfield County, Pennsylvania.   *See* Exhibit 9. Rejecting FHR's defenses, the court held that because FHR had failed to close by the deadline contained in its agreement with the Bank, and did not secure a written agreement modifying the closing date, FHR defaulted on its obligations, giving the Bank the right to terminate its purchase and sale agreement with FHR.   *Id.* at 11.   The Court further held that FHR's occupation of the real estate and plant was not pursuant to its failed sale agreement with the Bank, and that it was

in fact a mere holdover tenant and liable under the terms of its since-expired real estate lease with the Bank.  *Id.* at 11–12.

## II.        STANDARD FOR GRANT OF SUMMARY JUDGMENT

Summary judgment is mandated against a "party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Upon a showing by defendant that there is an absence of evidence to support the plaintiff's case, the plaintiff "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue."  *Garcia v. Kimmell*, 381 Fed. Appx. 211, 213 (3d Cir. 2010) (quoting *Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005)).

A review of the record and evidence in this case establishes that Plaintiff is unable to satisfy its burden of production, as it cannot provide any evidence to support its allegations. Instead, the evidence conclusively shows (i) that Kerry Group is not a party to either agreement upon which Plaintiff bases its claims, (ii) that Kerry is entitled to void the LOI because FHR's material representations induced it to enter into that agreement, (iii) that Kerry did not breach its alleged obligations, and (iv) that none of Kerry's actions damaged Plaintiff.

## III.        KERRY GROUP IS ENTITLED TO SUMMARY JUDGMENT ON ALL CLAIMS BECAUSE IT IS NOT A PARTY TO EITHER AGREEMENT

### A. Kerry Group Is Entitled To Summary Judgment On All Claims

Wisconsin courts hold that "one cannot enforce a contract against an entity that is not a party to it."  *Maciolek v. City of Milwaukee Employes' Ret. Sys. Annuity & Pension Bd.*, 288 Wis. 2d 62, 77, 709 N.W.2d 360 (Wis. 2006).  Furthermore, "ordinarily, a stockholder is not liable on contracts entered . . . even where the stockholder is the parent corporation and owns all the outstanding shares of the subsidiary that entered into the contract."  *Posyniak v. Sch. Sisters*

*of St. Francis of St. Joseph's Convent*, 180 Wis. 2d 619, 636–37, 511 N.W.2d 300, 308 (Wis. App. 1993).

Plaintiff's Second Amended Complaint (the "Complaint"), attached as Exhibit 16, asserts two remaining claims against both Kerry Inc. and Kerry Group alike:  the Sixth Claim (breach of the MCIA),  and the Seventh Claim (breach of the LOI).  The undisputed evidence proves that the parties to the MCIA were Kerry Inc. and FHR, *see* Exhibit 21, and that the parties to the LOI were also Kerry Inc. and FHR.  *See* Exhibit 38 at ¶ 4.  Kerry Group was not a party to either agreement, as evidenced by the agreements themselves.  *See* Exhibits 14, 21 (explicitly designating Kerry Inc, as the contracting party).  Consequently, Plaintiff's claims against Kerry Group for breach of contract fail under settled Wisconsin law, and so Kerry Group is entitled to summary judgment on all claims against it.

### B. Alternatively, Kerry Group Is Entitled to Judgment On The Pleadings As To All Claims Against It

A motion under F. R. Civ. P. 12(c) is "designed to provide a means of disposing of cases when the material facts are not in dispute . . . and a judgment on the merits can be achieved by focusing on the content of the competing pleadings."  *Wilson v. Am. Gen. Fin. Inc.*, 807 F. Supp. 2d 291, 296 (W.D. Pa. 2011).  A motion for judgment on the pleadings is governed by the same standard as a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted.  *Turbe v. Gov't of Virgin Islands*, 938 F.2d 427, 428 (3d Cir. 1991).  Accordingly, the trial court is required to view the facts presented in the pleadings in a manner favorable to the non-moving party, assuming all well-pleaded facts to be true.  *Angelastro v. Prudential-Bach Sec., Inc*, 764 F.2d 939, 944 (3d Cir. 1985).  However, the non-moving party is not entitled to a presumption about the correctness of his legal theories; it is the court's duty to construe and apply the law.  *Kanter v. Barella*, 489 F.3d 170, 177 (3d Cir. 2007).

In ruling on a motion for judgment on the pleadings, a court may consider any document that is "integral to or explicitly relied upon in the complaint." *Mele v. Fed. Reserve Bank of N.Y.*, 359 F.3d 251, 256 n.5 (3d Cir. 2004).  In the Complaint, Plaintiff has described and expressly relied upon two agreements: the March 5, 2010 MCIA, and the April 8, 2010 LOI.  These agreements form the basis of Plaintiff's surviving claims.  *See* Exhibit 16 at ¶¶ 40-44, 133; 50, 137, 145–147.  Defendants' Answer to the Complaint admits the existence of these agreements, but denies that they were breached.  Answer to Plaintiff's Second Amended Complaint (attached as Exhibit 40) at ¶¶ 40–44, 133; ¶¶ 2, 50, 137, 145–7.  Because these agreements are integral to Plaintiff's Complaint, which expressly relies upon them as the basis of its claims for relief, the Court may consider those agreements when ruling on this motion.

As discussed above, a claim for breach of contract cannot be brought under Wisconsin law against an entity that is not a party to that contract.  The Complaint, considered in the context of the two agreements on which it relies, establishes as a matter of law that Plaintiff cannot proceed against Kerry Group.  Examination of the plain language of the agreements, and the signatories thereto, clearly confirm that the only parties to them are FHR and Kerry Inc.  *See* Exhibit 14; Exhibit 21.  Plaintiff does not allege that Kerry Group was ever a party to these agreements.

Because it is undisputed that FHR and Kerry Inc. were the only parties to the agreements on which its claims are based, Plaintiff is unable, as a matter of law, to assert claims for breach of those agreements against Kerry Group.  Consequently, Plaintiff's allegations, even if assumed

to be true, fail to state a claim upon which relief can be granted as relates to Kerry Group, and this Court should grant judgment on the pleadings in favor of Kerry Group.[1]

## IV.   KERRY IS ENTITLED TO SUMMARY JUDGMENT ON THE SEVENTH CLAIM OF THE SECOND AMENDED COMPLAINT

Plaintiff's "Seventh Claim for Relief" asserted in the Complaint alleges that Kerry breached its obligations under the LOI between it and FHR by (i) negotiating to purchase the Premises from First Commonwealth Bank (the "Bank"), (ii) disclosing to the Bank the existence of the LOI and the intention of Kerry and FHR to consummate the transaction contemplated therein, and (iii) improperly terminating the LOI.  Because FHR misrepresented its ownership of and right to convey the Premises, and because those misrepresentations were material and induced Kerry to enter into the LOI with FHR, Kerry is entitled to void the LOI in its entirety. Furthermore, even if the LOI was enforceable, Plaintiff's allegations of breach by Kerry are speculative, without basis, and contradicted by the evidence.  Accordingly, Plaintiff's Seventh Claim for Relief must fail as a matter of law.

### A.   Kerry Was Induced To Enter Into The LOI By FHR's Material Misrepresentations And Thus Is Entitled To Void The Agreement Entirely

A party induced to enter into a contract by a material misrepresentation by the other party is entitled to void the agreement.  *Bank of Sun Prairie v. Esser*, 456 N.W.2d 585, 588 (Wis. 1990).  *See also* Restatement (Second) of Contracts § 164 cmt. b (1981) ("A representation need not be fraudulent in order to make a contract voidable . . . a non-fraudulent misrepresentation does not make the contract voidable unless it is material . . . .").  "Innocent misrepresentation is sufficient, for . . . it would be unjust to allow one who has made false representations even

---

[1] In the event this Court does not grant summary judgment to Kerry Group based on the fact that Kerry Group is not a party to any of the contracts at issue, Kerry Group joins Kerry Inc. and moves for summary judgment on all claims based on the grounds discussed below.

innocently, to retain the fruits of a bargain induced by such representations." *Schnuth v. Harrison*, 44 Wis. 2d 326, 338, 171 N.W.2d 370, 376 (Wis. 1969).  A misrepresentation is "any manifestation by words or other conduct by one person to another that, under the circumstances, amounts to an assertion not in accordance with the facts."  *Id.* at 338, 171 N.W.2d at 377.  A misrepresentation is "material" if it "would be likely to affect the conduct of a reasonable man with reference to a transaction with another person."  *Id.*  When a party so induced elects to void the resulting contract, "the parties are placed in the status quo as if no contract had ever been made. *Id.* at 339, 171 N.W.2d at 377.

It is indisputable that FHR misrepresented its ownership of, and interest in, the Premises to Kerry, and that those material misrepresentations induced Kerry to enter into the LOI and negotiate with FHR for purchase of the Premises.  *See* Affidavit of Pablo Gallo Llorente, attached as Exhibit 38 at ¶ 3.  When Kerry initially expressed interest in an acquisition, FHR represented to Kerry that it owned the Premises.  *See* Exhibit 38 at ¶ 3.  FHR made further statements to this effect in the early stages of the acquisition process.  For example, on April 20, 2010, Kerry's Pablo Gallo Llorente copied FHR's Paul Grillo on an email relating to a request for information pertaining to ownership, as well as FHR's taxpayer identification number.  In this email, Mr. Llorente stated that he "would assume that the owner of the property is Fresh Harvest River LLC, but would defer to Paul's confirmation."  *See* Exhibit 1; Exhibit 38 at ¶ 7. Mr. Grillo replied, addressing the request for the taxpayer identification number, but did not acknowledge or reply to the request for confirmation that FHR was the property's owner.  *Id.* The failure to refute Mr. Llorente's assumption regarding ownership implied that no correction was necessary, and constituted a representation that FHR was indeed the owner of the Premises. *Id.*

Further, in supplying an incomplete response to Kerry's due diligence requests on May 18, 2010, FHR failed to provide requested information which would have alerted Kerry to FHR's non-ownership, including information regarding leases, real estate holdings, contractual commitments, and any FHR breaches or defaults under any of its agreements. *See* Exhibit 2; Exhibit 38 at ¶ 12. Subsequent due diligence submissions made by FHR in response to Kerry's concerns regarding missing information similarly failed to disclose such information. *See* Exhibit 25. Indeed, when Kerry attempted to discuss the issue of ownership, FHR consistently failed to reply. *See* Exhibit 38 at ¶ 13.

In early May 2010, Kerry began to learn of facts suggesting that in fact FHR had no interest, legal or equitable, in the Premises. *See* Exhibit 38 at ¶¶ 9–10; Exhibits 3, 4, 5. After multiple inquiries by Kerry, FHR's attorney finally admitted that FHR did not hold title to the property on May 24, 2010. *See* Exhibit 6. FHR then began to insist that that it operated the premises under a lease "with an option to purchase," implying an equitable right to the Premises sufficient to grant it the absolute right to convey title to Kerry. *Id*. FHR made further representations to this effect on multiple occasions. *See* Affidavit of Gavin Caplis, attached as Exhibit 37, at ¶¶ 7–8; Exhibit 7 at ¶ 4; Exhibit 8. FHR did not then, nor has it to date, produced such a lease, due to the fact that no such "lease with an option to purchase" ever existed. In fact, while FHR's lease of the plant's equipment contained an option to purchase that equipment, it never had an option to purchase the real estate and plant under any lease with the Bank. *See* Exhibit 9 at 11. FHR had executed an agreement to purchase the plant and real estate from the Bank in August 2009, attached as Exhibit 27, but defaulted on that agreement when it was unable to close the transaction by the October 30, 2009 deadline set forth in that agreement. *See* Exhibit

9 at 10–11.  Subsequent to that default, not only did FHR have no interest in the Premises under that agreement, but it in fact had no lease at all on the plant and real estate.  *See id.* at 12.

Moreover, even if this Court takes FHR at its word—contrary to the evidence—that it never represented to Kerry in so many words that it owned the Premises, its own statements made in 2010 prove that it made misrepresentations to Kerry regarding its interest in the Premises.  FHR has (incorrectly) argued in this litigation that at all times it was forthcoming in informing Kerry that it did not hold title, and rather that it had an absolute right to convey the Premises to Kerry pursuant to its alleged "lease with an option to purchase."  *See* Exhibit 7 at ¶ 4.  This assertion was a misrepresentation.  At no time did such a lease ever exist, and FHR lost any absolute right to convey the Premises it may have had when it defaulted on its agreement to purchase the Premises from the Bank, giving the Bank the unilateral right to terminate. Indeed, the Bank chose to exercise its rights and formally terminated that agreement in its May 6 letter to FHR.  *See* Exhibit 20.  FHR's breach and resulting loss of any interest in the Premises has been conclusively decided by the Court of Common Pleas of Clearfield County, Pennsylvania, which has been affirmed by the Pennsylvania Superior Court, and denied review by the Supreme Court of Pennsylvania.  *See* Exhibit 9.  As such, even if FHR represented from the beginning of its negotiations with Kerry that it only had the absolute right to convey the Premises pursuant to an "option to purchase," such representations would have been false.

It is similarly beyond contention that the ownership of, and right to convey title to, the Premises was a material fact striking the heart of the contemplated transaction.  The conduct of a reasonable purchaser would undoubtedly be affected by the knowledge that the contemplated seller was not the property's true owner, and that the "seller" merely hoped to be able to purchase the property and then re-sell it at a higher price.  Indeed, Kerry's practice with respect

to real estate acquisitions is to negotiate only with the title-holder of the property to be acquired. *See* Exhibit 37 at ¶ 10; Exhibit 38 at ¶ 3.  A June 8, 2010 letter from Kerry General Counsel William Coole to Mr. Grillo regarding FHR's interpretation of Kerry's actions expressly confirmed this, stating that "the Letter of Intent was based on [Kerry's] understanding that Fresh Harvest River owned the Plant."  *See* Exhibit 11.  That letter further noted Kerry's right to void the LOI entirely.  *See id.* ("[S]ince [FHR's ownership of the Premises] has proven to not be the case, we do not think that at any point Kerry had any obligations to Fresh Harvest River under the Letter of Intent.").  Not only did Kerry understand this to be a material fact, *see id.*; Exhibit 38 at ¶ 3, but apparently FHR did as well.  FHR's concern that Kerry might prefer a direct purchase from the Bank betrays its recognition that had Kerry been aware that the Bank held title to the Premises and that FHR in reality had no absolute right to convey title to Kerry, it would never have entered into the LOI with FHR in the first place.

The evidence clearly shows that FHR misrepresented its ownership of the Premises to Kerry, which misrepresentations induced Kerry to negotiate the acquisition with FHR.  Even if, as Plaintiff claims, FHR made it clear to Kerry that it operated the Premises based on a lease with an option to purchase, and that it had the absolute right to convey title to Kerry, such representations were false, as was later confirmed by the Pennsylvania courts.  Because this fact was material to the agreement such that Kerry would not have entered into the LOI but for FHR's misrepresentations, Kerry is entitled to void the LOI and be placed in the position as if it never had any obligations under the agreement.  Accordingly, Kerry is entitled to summary judgment on all claims made against it under the LOI.

**B. Even If The LOI Were Enforceable, Kerry Did Not Breach Its Obligations And Did Not Cause FHR To Suffer Damages**

If this Court does not grant summary judgment in favor of Kerry on the claims made against it under the LOI on the ground that the LOI is voidable, it should grant summary judgment on these claims because Kerry did not breach its obligations under the LOI, and because its actions did not cause damage to FHR.

**1.      Kerry Was Not Prohibited From Negotiating With The Bank**

This Court has held that Kerry was legally entitled to discuss a possible purchase of the Premises from the Bank.  *See* Exhibit 13 at 8 ("The MCIA did not bar Kerry from contacting the Bank or attempting a direct purchase of the premises.").   The LOI contained an exclusivity clause, but this clause prohibited only *FHR* from negotiating with anyone else regarding purchase and sale of the Premises.  *See* Exhibit 14 at ¶ 5.  Therefore, to the extent Plaintiff claims that Kerry breached the LOI by negotiating with the Bank for purchase of the Premises, the evidence, as well as the prior opinion of this Court, establish that such claims must fail.

**2.      Kerry Did Not Disclose The LOI's Existence, Or Its Intent to Purchase the Premises from FHR**

Plaintiff has produced nothing beyond the speculation contained in its Complaint to support its allegation that Kerry disclosed the LOI or its negotiations with FHR to the Bank. As a result, Kerry is entitled to summary judgment on this claim.

Plaintiff's sole basis for its allegation that Kerry disclosed the LOI or its negotiations with FHR to the Bank is an alleged telephone conversation between the Bank's David Hepler and FHR's Jack Gray in mid-May 2010, during which Mr. Hepler allegedly asked "whether FHR had entered into an agreement to sell the Premises to Kerry."  *See* Exhibit 16 at ¶ 61.  But Plaintiff's account of that query from the Bank does not imply that the Bank knew about the

LOI, or had learned about it from Kerry.  Indeed, Kerry's Pablo Gallo Llorente has testified in his affidavit that no one from Kerry spoke to the Bank about the Premises until May 24, 2010.  Mr. Llorente has further testified that the only purpose of that discussion with the Bank was to confirm whether the Bank owned the Premises, and that at no time did Kerry disclose the existence or contents of the LOI to the Bank.

The parties have produced in excess of 325,000 pages of documents in discovery, and not a single document even suggests that Kerry made any improper disclosures to the Bank.  Because Plaintiff is unable to produce any evidence to support its claims, and because the evidence discovered proves precisely the opposite of Plaintiff's allegations, Kerry is entitled to summary judgment on the claim that it breached the confidentiality provision of the LOI.

### 3.    Kerry's Termination Of The LOI Was Proper

Kerry is likewise entitled to summary judgment on Plaintiff's claim that Kerry improperly terminated the LOI.  The LOI allowed either party to terminate the agreement in the event that a definitive written agreement had not been executed within 30 days.  Exhibit 14 at ¶ 7.  The only restriction on this termination right was that it could be exercised only in the event that "the parties are not then engaged in negotiations designed to lead to such a definitive agreement."  *Id.*

Plaintiff does not allege that FHR and Kerry reached a definitive written agreement.  The uncontroverted evidence further shows that negotiations designed to lead to such an agreement never took place, a circumstance entirely of FHR's own making.  Kerry diligently sent a draft purchase agreement to FHR on April 30, 2010, hoping to proceed expeditiously.  *See* Exhibit 17; Exhibit 38 at ¶ 8.  After receiving no response whatsoever from FHR, Kerry attempted to engage in substantive negotiation, but FHR never replied.  *See* Exhibit 18; Exhibit 23 ("[Andrew

Royston] asked about the process and was concerned (as am I) about the inexistent amount of progress as far as due diligence and negotiation of an agreement."). *See also* Exhibit 38 at ¶ 8. As a result, despite Kerry's best efforts, there were never any substantive negotiations regarding terms of the purchase, because simply, FHR failed to engage in them.

Because the undisputed evidence shows that more than 30 days had passed without execution of a definitive agreement, and that FHR failed to conduct any negotiations with Kerry regarding the substantive terms of such an agreement, Kerry is entitled to summary judgment on the claim that it improperly terminated the LOI.

### 4.  **Plaintiff Cannot Show That Kerry's Conduct Caused FHR To Suffer Cognizable Damages**

To state a breach of contract claim under Wisconsin law, a complaint must allege "(1) a contract between the plaintiff and the defendant that creates obligations flowing from the defendant to the plaintiff; (2) failure of the defendant to do what it undertook to do; and (3) damages" flowing from that failure. *Brew City Redevelopment Group, LLC v. The Ferchill Group*, 289 Wis. 2d 795, 807, 714 N.W.2d 582, 588 (Wis. App. 2006) (citing *Nw. Motor Car, Inc. v. Pope*, 51 Wis. 2d 292, 296, 187 N.W.2d 200, 203 (1971)). In evaluating a breach of contract claim, a court must determine whether a valid contract exists, whether a party has violated its terms, and whether any such violation is material such that it has resulted in damages. *Steele v. Pacesetter Motor Cars, Inc.*, 267 Wis. 2d 873, 880, 672 N.W.2d 141, 144 (Wis. App. 2003) (citing *Mgmt. Computer Servs., Inc. v. Hawkins, Ash, Baptie Co.*, 206 Wis. 2d 158, 178–83, 557 N.W.2d 67 (1996). Because damages are an essential element of a contract action, lack of damages resulting from an alleged breach should result in summary judgment against the plaintiff. *See Black v. St. Bernadette Congregation of Appleton*, 121 Wis.2d 560, 566, 360 N.W.2d 550, 554 (Wis. App. 1984). *See also Giddings v. Principal Fin. Group, Inc.*, No. 07-

CV-370, 2009 WL 742681 at *6 (E.D. Wis. March 18, 2009) ("[P]laintiff has sustained no damages as a result of the breach . . . Any of the foregoing reasons provides adequate ground for granting defendants summary judgment as to plaintiff's breach of contract claim."). *But see Olympia Hotels Corp. v. Johnson Wax Dev. Corp.*, 908 F.2d 1363, 1372 (7th Cir. 1990) (citing *Vasselos v. Greek Orthodox Cmty. of St. Spyridon*, 24 Wis. 2d 376, 380, 129 N.W.2d 243, 245 (Wis. 1964)) (holding that a directed verdict based on lack of proven damages was inappropriate because "[t]he victim of a breach of contract is always entitled to nominal damages.").[2]

Moreover, even if a plaintiff has suffered provable damages, causation is essential; the damages must be the result of the alleged breach. *Wis. Knife Works v. Nat'l Metal Crafters*, 781 F.2d 1280, 1289 (7th Cir. 1986) ("As in tort law, so in contract law, causation is an essential element of liability. If the damage of which the plaintiff complains would not have been avoided by the promisor's not breaking his promise, the breach cannot give rise to damages.") (internal citations omitted). "In order to show liability, the wronged party must show that the breach of contract was a substantial factor in causing the injury." *5308 FAB Ltd. V. Team Indus., Inc.*, No. 10-C-183, 2012 WL 1079886 at *18 (E.D. Wis. March 30, 2012)

Because Plaintiff cannot show that it suffered any cognizable harm resulting from Kerry's alleged breaches of the LOI, Kerry is entitled to judgment in its favor on this claim. As this Court has observed, "the damages resulting from this [alleged] breach are unclear." *See* Exhibit 13 at 10. Plaintiff's sworn interrogatory answers assert that its damages consist of the

---

[2] We believe that the cases that rely on the 1984 intermediate appellate court's opinion in *Black* (summary judgment against plaintiff on breach of contract claim proper where plaintiff does not prove any damages) are well-reasoned and would be followed by Wisconsin courts today. The 1964 Wisconsin Supreme Court remarks in *Vasselos* (since plaintiff did not prove any damages at trial, "the most he could recover would be nominal damages of $1.") should not be taken to mean that a failure to prove damages in a breach of contract case would not support judgment against the plaintiff if a breach were established. In any case, the evidence here clearly establishes that Kerry did not breach either of the contracts at issue in this case.

loss of the ability to purchase the Premises from the Bank and to continue conducting its manufacturing business there in the future.  *See* Exhibit 19 at 15, 22.

Basic principles of contract law, however, bar recovery of Plaintiff's asserted damages. Damages must be reasonably foreseeable, or at least within the actual contemplation of the parties at the time of contracting.  *Reiman Assoc., Inc. v. R/A Adver., Inc.*, 102 Wis. 2d 305, 320, 306 N.W.2d 292, 300 (Wis. App. 1981).   Had Kerry not terminated the LOI, and had the transaction between it and FHR ultimately been consummated, FHR would not have retained ownership of the Premises, and would in fact have been conducting no business whatsoever on the Premises.  The loss of FHR's transaction with the Bank and its future ability to do business could not possibly have been contemplated by the parties at the time of contracting, as the very nature of the contemplated transaction would have resulted in Kerry assuming ownership of the Premises.

Even were such damages recoverable, Plaintiff cannot establish causation.   Kerry's termination of the LOI could not have caused FHR to lose its alleged transaction with the Bank and its ability to continue conducting its business on the Premises.  The evidence is indisputable that FHR's inability to purchase the Premises from the Bank was a direct result of FHR's breach of its purchase agreement with the Bank in October 2009, long before Kerry became involved. *See* Exhibit 9; Exhibit 20.   Nor could any alleged disclosure by Kerry of the LOI or its negotiations with FHR to the Bank have caused FHR to lose its transaction with the Bank.  Kerry had no contact with the Bank until May 24, 2010—more than two weeks after the Bank formally terminated its sale agreement with FHR.  Even then, the purpose of those conversations was solely to determine who held title to the Premises.  Consequently, the Bank's decision to formally terminate its agreement with FHR could not have been the result of any alleged

disclosure by Kerry. Though the Bank may have subsequently remained open to negotiating a new agreement with FHR, no such enforceable agreement was ever reached, as has been conclusively established by the Pennsylvania courts.  *See* Exhibit 9 at 10.

As such, Plaintiff is unable to show that Kerry's actions caused FHR's negotiations with the Bank to fail.  Plaintiff cannot establish that, had Kerry not terminated the LOI, FHR would have been able to (i) persuade the Bank to sell the Premises to FHR, (ii) raise the funds necessary to meet the Bank's purchase price and satisfy its debt obligations to the Bank, and (iii) secure substantial future business of Kerry, Heinz, and other potential customers.  A business may only seek damages for lost profits "if it can present credible evidence of business history and business experience sufficient to allow a fact finder to reasonably ascertain future lost profits."  *T & HW Enters. v. Kenosha Assocs.*, 206 Wis. 2d 591, 606 n.6, 557 N.W.2d 480, 485 n.6 (Wis. App. 1996).  At the time of this dispute, FHR had been in business for only one year, and had not operated at a profit.  *See* Exhibit 16 at ¶¶ 16–17; Exhibit 43.  Any and all of the damages alleged by Plaintiff not only fail for lack of causation, but also because they are entirely speculative and thus unrecoverable.

Because Plaintiff is unable to prove cognizable damages caused by Kerry's alleged actions, and because damages are an essential element of a breach of contract claim, Kerry is entitled to summary judgment on the Plaintiff's claims that it breached the LOI.

## V.   KERRY IS ENTITLED TO SUMMARY JUDGMENT ON THE SIXTH CLAIM OF PLAINTIFF'S SECOND AMENDED COMPLAINT

### A.  Kerry Had The Right To Negotiate A Deal With The Bank

As discussed *supra* at Page 10, this Court has held that Kerry was free to negotiate with the Bank for the purchase of the Premises.  Therefore, any negotiations between Kerry and the Bank could not have constituted a breach of the Mutual Confidential Information Act ("MCIA").

To the extent that Plaintiff claims otherwise, Kerry is entitled to summary judgment on such claims.

### B.  Kerry Did Not "Misuse" Any Information Protected By The MCIA

FHR has not, and cannot, produce any evidence supporting its claims that Kerry "misused" information protected by the MCIA.  The MCIA protected only information exchanged pursuant to the parties' manufacturing arrangement.  *See* Exhibit 21 ("Whereas [FHR] and Kerry, in a customer/supplier relationship, wish to exchange certain Confidential Information pertaining to contract manufacturing (the "Subject Matter")).  As the acquisition of the Premises by Kerry was not contemplated at the time of the MCIA's execution, information exchanged pursuant to the potential purchase was not subject to the MCIA's restrictions.

In April and May of 2010, Kerry conducted extensive due diligence regarding its contemplated acquisition of the Premises.  *See* Exhibit 38 at ¶¶ 6, 11–13.  That due diligence included several visits to the plant, as well as extensive requests for documents and information from FHR.  *See* Exhibit 22; Exhibit 31; Exhibit 38 at ¶ 5–6.  Indeed, the LOI specifically contemplated these inspections and exchanges of information.  *See* Exhibit 14 at §§ 2, 3.  Kerry's due diligence requests specifically sought information relating to the manufacturing and research and development capabilities of the plant, formulations owned by FHR, equipment, and FHR customer information.  *See* Exhibit 22.  The parties did not execute any confidentiality agreement to govern the exchange of such information, nor did the LOI provide for such treatment.  Because this information was exchanged pursuant to Kerry's due diligence, rather than pursuant to its manufacturing relationship with FHR, Kerry was not restricted in its use of such information by the MCIA.

Plaintiff's inability to produce any evidence beyond pure speculation was foreshadowed by this Court's prior observation:

> Plaintiff may be hard-pressed to prove causation, i.e., that Kerry, in fact, misused confidential information obtained pursuant to the MCIA in its negotiations with the Bank.  The Second Amended Complaint acknowledges that Kerry is active in the industry.   Thus, it may have had sufficient independent knowledge to negotiate with the Bank.   Moreover the MCIA did not prevent Kerry from obtaining information in the public domain, or that was otherwise available.  See MCIA ¶ 1(c).
>
> Exhibit 13 at 8.

Indeed, after extensive discovery Plaintiff is still unable to produce such evidence.  Rather, the uncontroverted evidence shows that in its negotiations with the Bank, Kerry never "misused" information obtained pursuant to its manufacturing relationship with FHR.  *See* Exhibit 38 at ¶¶ 24–26.  If Kerry used any information in constructing its negotiations with the Bank (which itself had extensive knowledge of the Premises and its capabilities due to its ownership of them), the information used was obtained in the course of due diligence and not protected by the MCIA.  Further, as this Court noted, Kerry maintained extensive knowledge due to its substantial experience and activity in the industry.  *See* Exhibit 13 at 8.  had no need to, and indeed did not, rely on any information obtained solely pursuant to its manufacturing relationship with FHR in its negotiations with the Bank.

### C. Plaintiff Cannot Show That Any Alleged "Misuse" Of "Confidential Information" Caused Cognizable Damage to FHR

This Court has commented at some length about the difficulty of determining damages resulting from an alleged breach of the MCIA:

> The damages resulting from the alleged breach are somewhat difficult to determine, and may well be minimal.  Plaintiff does not allege that Kerry disclosed its confidential information to the marketplace, but rather, that Kerry misused the information for its own negotiations with the Bank.  Plaintiff would not be damaged merely because Kerry allegedly obtained unfair advantages over

the *Bank*.  Indeed, Plaintiff likely will not be entitled to recover all damages which allegedly flowed from its subsequent business failure, as those events likely did not reasonably result from the alleged breach.  The MCIA did not bar Kerry from contacting the Bank or from attempting a direct purchase of the Premises.  To the contrary, the MCIA limited only the misuse of confidential information during such negotiations.  The measure of damages must be similarly limited . . .

Exhibit 13 at 8.

Indeed, Plaintiff is unable to prove any damages with a sufficient causal relationship to Kerry's alleged actions, and as a result, Kerry is entitled to summary judgment on Plaintiff's claims under the MCIA.

**1.  Any Alleged Misuse of "Confidential Information" In Kerry's Negotiations With The Bank Did Not Harm FHR**

As this Court noted, any alleged misuse of information protected by the MCIA by Kerry in its negotiations with the Bank does not establish a cognizable harm to FHR.  *See* Exhibit 13 at 8.  Kerry's use of such information would relate only to its position regarding its negotiations with the Bank, and any advantage Kerry gained over the Bank did not cause harm to FHR.

**2.  Plaintiff Cannot Prove That Any Alleged Misuse Of "Confidential Information" Caused The Bank To Breach Its Alleged Obligations To FHR**

As discussed *supra* at Pages 14–15, any alleged misuse of information protected by the MCIA could not possibly have damaged FHR's position relative to the Bank, as the Bank simply had no obligations to FHR.  The Bank's obligations to FHR became subject to termination at the Bank's will when FHR defaulted on its agreement to purchase the Premises in October 2009, before Kerry became involved.  At a minimum, the Bank had no obligations to, or agreement with, FHR subsequent to its formal termination of its agreements with FHR on May 6, 2010— nearly one month prior to any discussions between Kerry and the Bank occurred, as is established by the evidence.  *See* Exhibit 38 at ¶ 16.  Similarly, the Bank's decision to accelerate FHR's indebtedness occurred on May 18, 2010, prior to Kerry's first conversation with the Bank

and its attorney, and was the direct result of FHR's failure to cure the defaults which the Bank notified FHR of May 6, 2010.  *See* Exhibit 24.  The evidence is indisputable that the Bank, acting within its rights, elected to terminate its agreements with FHR and seek remedies based solely on FHR's breaches and defaults, rather than as a result of any alleged misuse of "confidential information" by Kerry.

For these reasons, Kerry is entitled to judgment as a matter of law on Plaintiff's claims that Kerry breached the MCIA.

## CONCLUSION

For all the reasons discussed above, Kerry Group plc is entitled to judgment in its favor on both claims, and Kerry is also entitled to summary judgment on both the Sixth and Seventh Counts of Plaintiff's Second Amended Complaint, and respectfully request that the Court so order.

Dated: February 15, 2013

Respectfully submitted,

s/ Mark A. Willard _____
Mark A. Willard
Audrey K. Kwak
Eckert Seamans Cherin & Mellott, LLC
U.S. Steel Tower
600 Grant Street, 44th Floor
Pittsburgh, PA 15219
Telephone:  (412) 566-6000
Facsimile:  (412) 566-6099

Michael R. Feagley
Emily M. Emerson
Arí Z. Cohn
Mayer Brown LLP
71 South Wacker Drive
Chicago, IL 60606
Telephone:  (312) 701-7826
Facsimile:  (312) 701-7711

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of Defendants' Memorandum in Support of Their

Motions for Summary Judgment on All Claims was served upon the following persons via operation of

the Court's CM/ECF System this 15th day of February, 2013:

Jason Levin, Esq.
Storch Amini & Munves PC
2 Grand Central Tower
140 East 45th Street
25th Floor
New York, NY 10017

*s/ Mark A. Willard*