IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CATAHAMA, LLC, as assignee of Fresh Harvest River LLC, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 2:10-cv-01140 |
| v. | ) ) | Hon. Terrence F. McVerry |
| KERRY INC. and KERRY GROUP PLC, | ) ) ) | |
| Defendants. | ) ) | |

**DEFENDANTS' MEMORANDUM IN SUPPORT
OF THEIR MOTION FOR SUMMARY JUDGMENT**

Mark A. Willard (Pa. No. 18103)
Amy J. Roy (Pa. No. 86584)
ECKERT SEAMANS CHERIN & MELLOTT, LLC
600 Grant Street, 44th Floor
Pittsburgh, PA 15219
Phone: (412) 566-6000
Fax: (412) 566-6099

Michael R. Feagley (*pro hac vice*)
Emily M. Emerson (*pro hac vice*)
Joshua A. Faucette (*pro hac vice*)
Charles M. Woodworth (*pro hac vice*)
MAYER BROWN LLP
71 South Wacker Drive
Chicago, Illinois 60606
Phone: (312) 782-0600
Fax: (312) 701-7711

*Attorneys for Kerry Inc. and
Kerry Group plc*

## TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................................................... 1

STATEMENT OF FACTS ............................................................................................... 4

STANDARD FOR SUMMARY JUDGMENT ................................................................ 18

ARGUMENT .................................................................................................................. 18

I.   Kerry Is Entitled To Summary Judgment On Count VII. ...................................... 18

    A.   The LOI Was Voidable Because Kerry Was Induced To Enter It By A Material Misrepresentation. ....................................................................... 18

    B.   FHR Itself Disclosed The Existence Of The LOI Prior To Kerry's Alleged Disclosure. ..................................................................................... 22

    C.   Kerry Was Entitled To Terminate The Letter of Intent On May 26. .................... 23

    D.   Plaintiff Cannot Show That The Alleged Breaches Caused The Harm For Which It Seeks Damages. ......................................................................... 25

II.  Kerry Is Entitled To Summary Judgment On Count VI. ....................................... 28

    A.   None Of The Information Disclosed By FHR Is Subject To The MCIA Because It Was Not Marked Or Designated As Confidential. .............................. 29

    B.   Plaintiff Cannot Show That The Information Kerry Relied On During Its Negotiations With The Bank Was Protected By The MCIA. ............................... 31

    C.   Plaintiff Cannot Show That FHR Suffered Any Harm That Was Proximately Caused By A Breach Of The MCIA. ................................................................ 35

III. Kerry Group Is Entitled To Summary Judgment Because It Is Not A Party To Either Contract. ................................................................................................. 37

CONCLUSION ............................................................................................................... 38

i

.

### TABLE OF AUTHORITIES

Page(s)

**CASES**

*Armstrong v. Colletti,*
276 N.W.2d 364 (Wis. App. 1979)...............................................................29

*Bank of Sun Prairie v. Esser,*
456 N.W.2d 585 (Wis. 1990)......................................................................18

*Black v. St. Bernadette Congregation of Appleton,*
360 N.W.2d 550 (Wis. App. 1984)..............................................................27

*Brew City Redevelopment Grp., LLC v. The Ferchill Grp.,*
714 N.W.2d 582 (Wis. App. 2006)..............................................................27

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986).................................................................................18

*Cent. Brown Cnty. Water Auth. v. Consoer, Townsend, Envirodyne,*
No. 09-C-0131, 2013 WL 501419 (E.D. Wis. Feb. 11, 2013)..........................27

*Den-Tal-Ez, Inc. v. Siemens Capital Corp.,*
566 A.2d 1214 (Pa. Super. 1989)...............................................................30

*Dobratz v. Thomson,*
468 N.W.2d 654 (Wis. 1991)......................................................................19

*Dynegy Mktg. & Trade v. Multiut Corp.,*
648 F.3d 506 (7th Cir. 2011) .....................................................................37

*Entzminger v. Ford Motor Co.,*
177 N.W.2d 899 (Wis. 1970)......................................................................23

*First Nat'l Bank & Trust Co. of Racine v. Notte,*
293 N.W.2d 530 (Wis. 1980)......................................................................19

*Foss v. Heineman,*
128 N.W. 881 (Wis. 1910)..........................................................................26

*Geiger v. Hanneman,*
801 N.W.2d 350, 2011 WI App 114..............................................................30

*Holmes v. Sec. Investor Prot. Corp.,*
503 U.S. 258 (1992) (Scalia, J., concurring in judgment) ..............................36

*Maciolek v. City of Milwaukee Employees' Ret. Sys. Annuity & Pension Bd.,*
709 N.W.2d 360 (Wis. 2006)......................................................................37

*Matthews v. Wis. Energy Corp.*,
  534 F.3d 547 (7th Cir. 2008) ................................................................................... 27

*Metro. Sewerage Comm'n v. R.W. Constr.*,
  241 N.W.2d 371 (Wis. 1976) .................................................................................... 23

*Mgmt. Computer Servs., Inc. v. Hawkins, Ash, Baptie & Co.*,
  557 N.W.2d 67 (Wis. 1996) ................................................................................. 23, 24

*Mkt. St. Assocs. Ltd. P'ship v. Frey*,
  21 F.3d 782 (7th Cir. 1994) ...................................................................................... 25

*N.A.A.C.P. v. N. Hudson Reg'l Fire & Rescue*,
  665 F.3d 464 (3d Cir. 2011) ..................................................................................... 18

*Nw. Motor Car, Inc. v. Pope*,
  187 N.W.2d 200 (1971) ............................................................................................ 27

*Podobnik v. U.S. Postal Serv.*,
  409 F.3d 584 (3d Cir. 2005) ..................................................................................... 18

*Posyniak v. Sch. Sisters of St. Francis of St. Joseph's Convent*,
  511 N.W.2d 300 (Wis. App. 1993) ........................................................................... 38

*Reiman Assoc., Inc. v. R/A Adver., Inc.*,
  306 N.W.2d 292 (Wis. App. 1981) ........................................................................... 26

*Schnuth v. Harrison*,
  171 N.W.2d 370 (Wis. 1969) ............................................................................... 18, 19

*Shy v. Indus. Salvage Material Co.*,
  58 N.W.2d 452 (Wis. 1953) ...................................................................................... 23

*Vasselos v. Greek Orthodox Cmty. Of St. SPyridan*,
  129 N.W.2d 243 (Wis. 1964) .................................................................................... 27

*Wis. Knife Works v. Nat'l Metal Crafters*,
  781 F.2d 1280 (7th Cir. 1986) (Posner, J.) .............................................................. 27

**RULES**

FED. R. CIV. P. 56(a) ................................................................................................... 18

FED. R. CIV. P. 56(e)(2) ............................................................................................... 18

**OTHER AUTHORITIES**

2 RUSSELL M. WARE, THE LAW OF DAMAGES IN WISCONSIN § 26.4 (2d ed. 1995) ....................... 27

RESTATEMENT (SECOND) OF CONTRACTS § 164 cmt. b (1981)......................................................19

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendants Kerry Inc. ("Kerry") and Kerry Group plc ("Kerry Group") (collectively, the "Kerry defendants") submit this memorandum in support of their motion for summary judgment on the two remaining counts of the Second Amended Complaint ("SAC"), Counts VI and VII.

## INTRODUCTION

In 2010, Kerry entered into a non-binding letter of intent ("LOI") with Fresh Harvest River LLC ("FHR") to purchase a food production facility located in DuBois, Pennsylvania. The undisputed facts show that when it entered into the LOI Kerry reasonably believed, based on FHR's statements and conduct, that FHR owned the property, plant and equipment for which Kerry had conditionally offered $22 million. Subsequently, Kerry discovered that FHR was merely a hold-over tenant on the property and had no ownership interest to sell. At that point, Kerry terminated the LOI and then negotiated a purchase with the real owner—First Commonwealth Bank (the "Bank"). When the Bank sought to evict FHR from the property and pursued other creditor remedies against it, FHR went on the offensive, suing the Kerry defendants and the Bank on the theory that they were somehow responsible for the failure of FHR's business  After FHR declared bankruptcy, it assigned its claims against the Kerry defendants and the Bank to one of its creditors, plaintiff Catahama LLC, which had also tried to purchase the property from the Bank.

This Court's rulings on motions to dismiss eliminated the Bank from the case and left only two breach of contract claims against the Kerry defendants.  The Court denied the Kerry defendants' motions to dismiss those claims based on the facts plaintiff alleged—allegations that (i) conveniently omitted the crucial fact that FHR had led Kerry to believe that it owned the property it was trying to sell and (ii) falsely portrayed Kerry as dealing unfairly with FHR, by

improperly terminating the LOI and using FHR's confidential information to "cut out the middleman" and buy the property directly from the Bank.  After nineteen months of discovery, including 20 depositions, it is now clear beyond dispute that these allegations are simply not true and that the Kerry defendants are entitled to summary judgment on both Counts VI and VII.

There are three separate and independent reasons why Kerry is entitled to summary judgment on plaintiff's claim that Kerry breached its obligations under the LOI by (i) disclosing the existence of the LOI to the Bank and (ii) terminating the LOI at a time when plaintiff claims Kerry and FHR were engaged in negotiations over the terms of a definitive purchase agreement. First, the undisputed facts show that Kerry was induced to enter into the LOI by a material misrepresentation—that FHR owned or at least had an absolute right to sell the property that Kerry was offering to buy.  Under the governing Wisconsin law, Kerry had the right to declare the LOI null and void; having done so when it learned the truth, Kerry was not bound by any of the terms of the LOI and cannot be liable for any claimed breach.

Second, regardless of whether the LOI was voidable, plaintiff cannot complain that Kerry breached it.  The undisputed facts show that FHR itself disclosed the existence of the LOI to the Bank before Kerry allegedly did.  And there can be no doubt that Kerry had the right to terminate the LOI when it did.  Contrary to the allegations of the complaint, FHR was not engaged in good faith negotiations with Kerry over the terms of a definitive purchase agreement when Kerry terminated the LOI. Indeed, it was not "negotiating" at all.  Instead, it was frantically trying to keep Kerry from discovering the true ownership of the property while two of FHR's three principals tried (unsuccessfully) to find a way to buy the property from the Bank—*not* so they could sell it to Kerry, but rather because they wanted to keep it for themselves.

Third, there is no causal connection between the alleged breaches and the harm plaintiff claims Kerry inflicted on FHR.  Plaintiff does not seek damages on the theory that FHR lost the opportunity to make a profit by "flipping" the property to Kerry. Instead, plaintiff's theory is that by approaching the Bank directly Kerry interfered with FHR's ability to purchase the property from the Bank for its own continued use.  Plaintiff claims that, absent Kerry's interference, FHR would have somehow obtained control of the property and magically transformed itself from an abject failure into a roaring success.  But no reasonable jury could accept such a speculative theory of causation. Nor were the damages plaintiff seeks reasonably foreseeable to Kerry at the time it entered into the LOI, in the belief that FHR owned the property and was serious about selling it to Kerry.

Plaintiff's claim for breach of the Mutual Confidential Information Agreement (the "MCIA"), also fails for multiple reasons.  First, plaintiff cannot carry its burden of showing that FHR provided Kerry with "Confidential Information" that was subject to the restrictions set forth in the MCIA.  Among other things, the MCIA provided protection only for ▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ There is no evidence that FHR ever provided Kerry with a writing marking or designating *any* information as confidential.

Second, plaintiff's claim that Kerry used FHR's Confidential Information for an improper purpose—to attempt to buy the DuBois facility—fails in light of the fact that FHR expressly agreed in writing to permit Kerry to engage in due diligence for that very purpose.  The LOI contained no confidentiality provision nor did it prohibit Kerry from attempting to purchase the plant from its true owner once Kerry discovered the owner's identity.

Finally, plaintiff's claim for damages for breach of the MCIA suffers from the same fatal lack of causation as its claim for breach of the LOI.  Plaintiff cannot show that FHR's business

failure was the result of any misuse of Confidential Information by Kerry. On the contrary, it was FHR's own losses and inability to finance its business that led to its demise.

## STATEMENT OF FACTS[1]

### *FHR Leases The Plant From The Bank*

In the summer of 2008, the Bank foreclosed on a Dubois, Pennsylvania food-processing plant previously owned by Giuseppe's Finer Foods, Inc., acquiring title to both the real estate and improvements (the "Property") and certain equipment ("Equipment") (the Property and Equipment are referred to collectively herein as "the Plant"). SOF ¶ 5. A few months later, Jack Gray, Paul Grillo, and Edmund Abramson formed FHR for the purpose of acquiring the Plant from the Bank. *Id.* ¶ 6

FHR did not have sufficient financing to buy the Plant. Eventually, the Bank agreed to rent the Plant to FHR. *Id.* ¶ 7. The parties entered into a Property Lease dated April 1, 2009, and FHR began operations in or around May 2009. *Id.* ¶¶ 7-8. In June, FHR and the Bank executed an Equipment Lease, which gave FHR an option to purchase the Equipment (but not the Property) for $16 million. *Id.* ¶ 9. The Bank also extended two lines of credit to FHR totaling $6 million. *Id.* ¶ 10. At the end of August 2009, FHR and the Bank entered into an Agreement for the Sale of Real Estate ("Agreement of Sale") under which FHR agreed to buy the Property (not including the Equipment) for $10 million. *Id.* ¶ 11. That purchase was to be financed by a $2.5 million cash payment from FHR and a $7.5 million mortgage, which the Bank agreed to provide. *Id.* The Agreement provided that "the Closing shall occur on or before **October 30, 2009**, unless the parties hereto shall otherwise agree in writing." *Id.*

---

[1] References to "SOF ¶" followed by a number or to "Ex." followed by a number are, respectively, to specific paragraph numbers in or exhibits to Defendants' Concise Statement of Undisputed Material Facts, filed contemporaneously herewith.

### *FHR's First Contact With Kerry*

Kerry's first contact with FHR was at an "Enterprise Ireland" event in New York in late 2008 or early 2009.   SOF ¶ 14.   Kerry is a Wisconsin-based company that develops, manufactures, and delivers technology-based ingredients, flavors, and integrated solutions for the food and beverage industry.  *Id.* ¶ 3.  Paul Grillo of FHR introduced himself to a Kerry executive at the New York event as a representative of a private equity business that had just "acquired" a food products production facility in DuBois.  *Id.* ¶ 14.  He invited Kerry to visit the facility and, shortly after it opened, followed up with an emailed invitation.  *Id.*  Kerry representatives visited the Plant in July 2009, and were given a tour of the facility and a detailed presentation about its capabilities.  *Id.* ¶¶ 15-16.

### *FHR Loses Money And Cannot Buy The Property From The Bank*

Kerry had no further contact with FHR until March 2010. During the intervening months, FHR consistently lost money.  SOF ¶ 17.  In fact, as Catahama's principal, Herbert Feinberg, testified, FHR was "losing its shirt on this business," losing close to $3.4 million over the course of its first eight months on revenues of under $1 million.  *Id.*  FHR was unable to come up with the $2.5 million it needed to buy the Property by the October 30, 2009 deadline set forth in the Agreement of Sale.  *Id.* ¶ 12.  Although the Bank could have declared FHR in default under that Agreement, it did not do so.  *Id.*  Plaintiff contends that the Bank orally agreed to indefinitely postpone the closing date to enable FHR to obtain financing, but there was never a written agreement to that effect.  *Id.*  By its terms, the Property Lease expired on October 30, 2009 and was never renewed or extended.  *Id.* ¶ 13.  Nevertheless, FHR continued to occupy and operate the Property as a hold-over tenant.  *Id.*

By early 2010, FHR was nearing the end of its borrowing capacity under its agreements with the Bank and knew it needed additional financing. *Id.* ¶ 19. FHR's principals approached Feinberg about becoming "involved in" FHR or the Plant. *Id.* ¶¶ 18-19. On or about February 16, 2010, Feinberg's company, Catahama, entered into a credit agreement with FHR, under which it provided FHR with an additional $500,000 loan. *Id.* ¶ 19. By December 2010, FHR owed Catahama over $2.5 million. *Id.* ¶ 21.

### *Kerry Initiates Buy-Out Discussions*

In March 2010, Kerry approached FHR about the possibility of a "co-packing" arrangement under which FHR would fill orders for ███████ which was one of Kerry's customers. SOF ¶¶ 22-23. At Kerry's request, on or about March 5, 2010, FHR signed a 3-page form Mutual Confidential Information Agreement ("MCIA") that Kerry provided, governing the exchange of confidential information between Kerry and FHR ███████████████████ ██████████████████████████████████ *Id.* ¶ 24; Ex. 33 ["MCIA"]. Although the MCIA was mutual, its primary purpose was to protect formulas and other confidential information that Kerry and its customers would supply to FHR to enable it to manufacture products for them. SOF ¶ 24. The MCIA required ████████████████ █████████████████████████████████████████ █████████████████████████████████████████ ███████████████████████████████ MCIA ¶ 3.

████████████████████████
█████████████████████████████████████████
█████████████████████████████████████████
█████████████████████████████████████████

6

█████████████████████████   MCIA ¶ 2.  FHR never marked anything it gave to Kerry as "Confidential," "Proprietary," or with words to that effect, nor did it ever identify any oral or visual disclosures made during Kerry's visits to the Plant as confidential in a later writing.  SOF ¶ 26.

Kerry reasonably believed in March 2010 that FHR owned the Plant.  *Id.* ¶ 28.  Among other things, on or about March 12, FHR gave Kerry a copy of an audit conducted by Cook & Thurber that included FMR's unequivocal representation that "[t]he Fresh Harvest River company, with the operating plant located in DuBois, PA, is the result of the formation of a new company as a result of the ***purchase of this facility*** in May of 2009."  *Id.* (Emphasis added). While Kerry representatives were still at the Plant observing the Plant's production of the ████████████, Kerry executives decided to explore the possibility of acquiring the Plant from FHR.  *Id.* ¶ 29.  As a result, Kerry sought additional information from FHR—information that FHR once again provided without any confidentiality designation.  *Id.* ¶¶ 29-30.

On March 31, 2010, Kerry executives visited the Plant and had dinner with FHR's Grillo to explore whether FHR had an interest in selling the Plant.  *Id.* ¶ 31.  Grillo admits that during that dinner, he "told Kerry we had the absolute right to sell the plant to them."  *Id.*  He also referred to himself and Gray as "the owners of the business and the plant," and said that the Plant was "[t]heir[s.]"  *Id.*  Kerry presented an informal, verbal offer of $16 million, which Grillo said was too low.  *Id.*

On April 8, 2010, Kerry sent FHR a nonbinding written proposal to acquire the Property and Equipment (referred to herein as the "Letter of Intent" or "LOI").  *Id.* ¶ 32; Ex. 52A ["LOI"]. Kerry's draft of the LOI proposed a purchase price of ██████████████████████████

████████████████████████████████████████████

███████████ LOI ¶ 1.   The LOI ███████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████ *Id.* ¶ 1.  It was clear from the LOI that Kerry was proposing

to buy FHR out lock, stock and barrel: among other things, the purchase and sale was

conditioned on ████████████████████████████████████████

██████████████████████████████████████████████████

██████████████ *Id.* ¶ 2(d), (e).

　　　The LOI did not contain ████████████████████████████

███████████████████████████ SOF ¶ 33.  It did, however, contain an

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████ *Id.*

Since Kerry believed that FHR owned the Plant, ████████████████████████

██████████████████████████████████████████████████

*Id.*

　　　The LOI was ████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████ LOI ¶ 7.

　　　FHR accepted the LOI on April 14.  SOF ¶ 35.  Although FHR knew that it did not own

either the Property or the Equipment, it did not disclose that fact to Kerry before accepting the

LOI.  *Id.*  The only change that FHR made in the LOI that Kerry tendered to it was ██████████

███████████████████████████████████████ *d.*

*Kerry Conducts Due Diligence*

A week after FHR signed the LOI, Kerry transmitted a lengthy due diligence request list to FHR. SOF ¶ 36. As part of its investigation, Kerry asked for ███████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ *Id.* With FHR's prior approval, ██████████████████████████████████████████████████████ ███████████████ *Id.* ¶ 37. Kerry also ████████████████████████████████████ ███████████████████████████████ visited the Plant with the knowledge and permission of FHR. *Id.* ¶ 38.

At various points following the execution of the LOI, FHR avoided responding to Kerry's inquiries in ways that would have revealed that it did not own the Plant, even though Grillo testified that he could "[a]bsolutely" "understand that [Kerry] would be interested in knowing who actually owned the property." *Id.* ¶ 40. For example, on April 20, 2010 Kerry's head of mergers and acquisitions, Pablo Gallo Llorente, sent an email to Grillo, stating that he "would assume that the owner of the property is Fresh Harvest River LLC, but   would   defer   to   Paul [Grillo]'s confirmation." *Id.* He also asked for the tax ID site number. Grillo did not take this opportunity to tell Gallo Llorente that the Bank owned the Property and Equipment. *Id.* Instead, he evaded Kerry's question, stating that

> While requesting the tax id site numbers for you from my attorneys, they suggested that we hold off on any site visits on these issues until the definitive agreement is completed. They are pretty conservative would prefer to get that completed first.

*Id.*

On April 30, Kerry sent a draft purchase and sale agreement ("PSA") to FHR as a starting point for negotiations. *Id.* ¶ 43. FHR never gave Kerry any comments on the draft PSA, nor were any discussions ever held with respect to the terms of that proposed agreement. *Id.*

While Kerry was proceeding on the assumption that FHR had the ability to sell the Plant to it and was interested in doing so, two of FHR's principals (Gray and Grillo) were having discussions with the Bank about the possibility of acquiring the Plant at a lower price than FHR had agreed to pay through a new entity the two of them had recently formed called Creative Foods, LLC ("Creative Foods"). *Id.* ¶¶ 41, 56. Gray and Grillo left Abramson out because they believed that the Bank was unlikely to be willing to deal with him as a result of Abramson's refusal to honor a $42 million guarantee in another transaction. *Id.* ¶ 41. Neither FHR nor Creative Foods had any financing,[2] and it is thus unclear how Gray and Grillo intended to proceed. What is clear, however, is that FHR's principals recognized that FHR's unperformed 2009 agreement to buy the Property from the Bank and its option to buy the Equipment were worthless, even if they somehow remained in effect, since they would have required FHR to pay $26 million for the Property and Equipment—$4 million more than Kerry had proposed to pay FHR for the Plant. *Id.* ¶¶ 9, 11.

On May 6, 2010, the Bank sent FHR a letter declaring FHR in default of its obligations under the 2009 Agreement of Sale and terminating that Agreement. *Id.* ¶ 44. The letter also declared FHR in default under its Property Lease and terminated that Lease because FHR had not paid rent since September 2009 and owed the bank $320,000 in back rent. *Id.* The Bank

---

[2] In fact, FHR's attorney sent a letter to the Bank on or about on April 27, 2010, acknowledging its continued inability to obtain the funding necessary to close the purchase of the Property under the Agreement of Sale. SOF ¶ 42. In that letter, the attorney stated that FHR was seeking additional capital and intended to make a new offer to the Bank. *Id.* FHR never did so, and it is undisputed that it "had zero funds with which to purchase the property." *Id.*

demanded payment and possession of the Property by May 31, 2010. *Id.* On May 6, 2010, the Bank also sent FHR three other letters declaring it in default under the Equipment Lease and the two credit agreements; those letters gave FHR until May 17 to cure the defaults by making certain payments. *Id.* FHR never disclosed any of its agreements with the Bank to Kerry and also did not disclose its receipt of the May 6 default letters. *Id.* ¶ 46; *see id.* ¶ 45.

### *Kerry Discovers That The Bank Owns The Plant*

Around the time that the May 6 letters were sent, Kerry received the first inkling that FHR might not own the Plant when it received an unsolicited email from a real estate broker named Jeff Counsell. SOF ¶ 47. Counsell told Gallo Llorente that



³ *Id.* Counsell also reported that,

⁴ *Id.*

Kerry's representatives did not give much weight to Counsell's reports because they thought that he and the unnamed consultant were attempting to find a way to obtain a commission from the sale of the Plant. *Id.* ¶ 49. Nevertheless, Kerry began to delve more deeply into the ownership issue. *Id.* ¶ 50. Gavin Caplis, who was then Kerry Group's Global Director of Business Development, testified that the situation was unprecedented in his experience: "I can think of no other example in my reasonably long career with Kerry and many transactions where

---

³ The "consultant" who approached Counsell was Leonard Davis. Davis had visited the Plant on March 25 and April 6, 2010 and had learned from FHR that Kerry was "interested in purchasing the facility." ¶ 48.

⁴ In fact, on May 19, 2010, Gray and Grillo made an $18.65 million offer to the Bank for the Property and Equipment on behalf of Creative Foods. ¶ 56.

11

I've encountered a problem like this, where we've written an LOI and subsequently discovered the item we're offering to buy is not owned by the people we're offering to buy it from." *Id.*

In early and mid May 2010, Caplis placed two calls to Paul Grillo to ask about the ownership issue. *Id.* ¶ 51. Although at least one of those calls came after FHR had received the May 6 default and termination letters from the Bank, Grillo told Caplis that FHR "had the absolute right to sell the plant to [Kerry]." *Id.* Grillo also said that FHR was "in control of the situation." Grillo and Caplis disagree over whether Grillo told Caplis that FHR had "options and mortgages that allowed us to sell" or whether Grillo said that "he owns this property." *Id.* But in either case, the statement was not true, inasmuch as FHR had no ownership interest in either the Property or the Equipment and any claimed contractual rights it might have had to purchase the Property or the Equipment had been terminated. *Id.* ¶¶ 44, 51, 53.

While it was investigating the ownership issue, Kerry attempted on multiple occasions to discuss its draft PSA with FHR, without success. *Id.* ¶ 52. By May 14, 2010, FHR had retained new counsel, who sent an email on that date to Kerry's general counsel, William Coole, stating that he was "scheduled to speak with [FHR] again over the weekend/early next week" and that once he did so, he would "be in a position to discuss . . . the transaction." *Id.* But that discussion never happened.

On May 18, 2010, the Bank sent additional letters to FHR stating that it had failed to cure its defaults and accelerating FHR's revolving and non-revolving lines of credit, terminating the Equipment Lease, and demanding that FHR surrender the Equipment. *Id.* ¶ 53. Once again, FHR did not disclose the existence of these letters to Kerry. *Id.*

FHR finally responded to Kerry's formal due diligence requests on May 18, 2010. *Id.* ¶ 54. FHR's response once again sidestepped all of Kerry's requests for information about

12

ownership of the Plant, but provided a wealth of other information about the Property, Equipment, IT systems, intellectual property, and FHR's customers, vendors, sales data, and personnel information. *Id.* In light of the absence of information pertaining to FHR's ownership of the Plant, Kerry obtained a Dun & Bradstreet report on FHR on May 19, 2010. *Id.* ¶ 55. Through that report, Kerry discovered UCC filings reflecting security interests held by the Bank on all of FHR's assets—filings that had not been disclosed in FHR's due diligence responses. *Id.*

On May 24, 2010, FHR provided supplemental responses to Kerry's due diligence requests, which once again failed to provide the requested information relating to ownership of the Plant. *Id.* ¶ 58. However, later the same day, FHR's attorney provided Kerry with a title commitment reflecting that title to the Plant was held by the Bank. *Id.* He told Kerry, however, that FHR was operating the Plant based on a "lease with an option to purchase." *Id.* Whether the lawyer knew it or not, that statement was untrue: the Property Lease never included an option to purchase the Property and, in any event, by May 24, the Bank had terminated all of its agreements with FHR and accelerated its debt—a fact that FHR did not disclose. *Id.* ¶¶ 7, 44, 53, 58.

On May 25, Gallo Llorente had a conversation with the Bank's outside counsel, Paul McGrath, about ownership of the Property. *Id.* ¶ 59. During this conversation, Gallo Llorente did not mention the LOI or suggest that Kerry was attempting to acquire the Plant from FHR. *Id.* The Bank, however, already knew about the LOI. At some point between May 23 and May 25, a Bank officer had asked Gray who their new "investor" was. *Id.* ¶ 57. Gray testified that he told the Bank officer that it was Kerry and that he revealed both the existence of the LOI and of the draft PSA that Kerry had provided to FHR at the end of April. *Id.*

On May 26, Gallo Llorente and Coole had a conversation with the Bank's representatives (David Hepler and McGrath), who confirmed that the Bank owned the Plant. *Id.* ¶ 60. McGrath's notes of that conversation refer to the LOI. *Id.* For purposes of this summary judgment motion, we will assume that a reasonable jury could conclude that Kerry mentioned the LOI during that conversation.

Later the same day, Caplis called Grillo and orally terminated the LOI. *Id.* ¶ 61. The next day, Coole confirmed the termination in writing, citing the termination provision in ¶ 7 of the LOI. *Id.* ¶ 62.

### *Kerry Enters Into Negotiations With The Bank And FHR Threatens Litigation*

After terminating its LOI with FHR, Kerry began talking to the Bank about acquiring the Plant. SOF ¶ 63. FHR reacted to news that Kerry was negotiating directly with the Bank by issuing a threatening letter claiming that those discussions were a "serious breach of our good faith customer/supplier relationship" and violated the ▮▮▮▮▮▮ of the LOI, which FHR characterized as ▮▮▮▮▮▮

▮▮▮▮▮▮ *Id.* ¶ 64. Kerry responded a few days later, ▮▮▮▮▮▮

▮▮▮▮▮▮

*Id.* ¶ 65. Kerry's general counsel also noted that ▮▮▮▮▮▮

▮▮▮▮▮▮

▮▮▮▮▮▮

▮▮▮▮▮▮

14

Unbeknownst to Kerry, on June 3, Feinberg had submitted a $15 million bid to the Bank for the Plant on behalf of Catahama.[5]  *Id.* ¶ 66.  Kerry offered ███████  *Id.* ¶ 67.  The Bank's counsel told Kerry that it had a "substantially" higher offer and should submit a bid for "the maximum that you are willing to pay for the asset."  *Id.* ¶ 68.  Kerry increased its offer to $20 million on June 11, and the Bank accepted it.  *Id.*

On June 14, 2010, Catahama made a last-ditch attempt to acquire the Plant, increasing its bid to $16.5 million.  *Id.* ¶ 69.  After Kerry entered into a letter of intent with the Bank on June 24, Feinberg sent a letter to Kerry Group's Caplis trying to force Kerry to withdraw.  *Id.* ¶ 70.  In that letter Feinberg claimed—falsely—that he held "a 60% interest" in FHR and was "the controlling owner of FHR."[6]  *Id.*  The letter went on to accuse Kerry of interfering with FHR's negotiations with the Bank:

> Because we had been leasing the plant with an option to purchase (at the time we were in the process of renegotiating the FHR purchase from the bank), your affiliate [Kerry] apparently felt that it could interfere with my negotiations with the bank and buy the plant and equipment directly from it.

*Id.*  The letter also threatened litigation and suggested that Caplis should visit Feinberg at Lake Como in Italy to talk.  *Id.*  In July, Caplis had a telephone conversation with Feinberg in which Feinberg described himself as "a significant shareholder" of several of Kerry's customers and told Caplis that if he "didn't want to cause embarrassment for Kerry or further pain," he should

---

[5]  Although FHR took the position in its May 28 letter to Kerry that the LOI was still in effect, it showed Feinberg a copy of the LOI on or before June 3, when he made his first offer to the Bank on behalf of Catahama. SOF ¶¶ 64, 66. In fact, Feinberg clearly used the Kerry LOI as a template for his own offer. *Id.* ¶ 66.

[6]  Catahama was a creditor of FHR's, but Feinberg had no ownership interest at all in FHR. SOF ¶ 2.

make Kerry "'back off the deal.'"[7] *Id.* ¶ 71. Kerry did not capitulate in the face of Feinberg's threats and instead signed a definitive agreement with the Bank.[8] *Id.* ¶ 72.

FHR's corporate witness and Feinberg both testified that if FHR, Catahama, or Creative Foods had acquired the Plant from the Bank, they "would not have flipped it" by selling it to Kerry in the transaction contemplated by the LOI. *Id.* ¶ 80. Instead, FHR or Catahama would have kept the Plant and "[r]un a business"; according to plaintiff, that business would have been extremely profitable. *Id.* It is on that basis that plaintiff seeks damages in this lawsuit, claiming that Kerry's termination of the LOI and its direct approach to the Bank interfered with FHR's ability to buy the Plant by "put[ting] [FHR] in a lousy bargaining position [with the Bank]." *Id.* ¶ 81.

### The Bank Pursues Its Creditor Remedies And FHR Sues

In July 2010, the Bank elected to enforce its security interest in FHR's accounts receivables by demanding that FHR's customers remit payments of accounts receivables directly to the Bank. SOF ¶ 73. On July 20, 2010, FHR filed this suit against the Bank and the Kerry defendants in the Southern District of New York. Dkt. 1. Less than a week later, the Bank filed a Complaint in Confession of Judgment in Ejectment in the Court of Common Pleas, Clearfield County, Pennsylvania, seeking to evict FHR from the Property. SOF ¶ 76. After the Bank filed a writ of confession, as permitted by its agreements with FHR, FHR petitioned to strike the judgment, stay enforcement of the writ of possession, and stay proceedings pending resolution of this lawsuit. *Id.* On September 3, 2010, the Common Pleas court rejected FHR's arguments,

---

[7]  Feinberg is a wealthy and sophisticated investor who describes himself as "[o]ne of the largest" shareholders of Pepsi and "the largest individual shareholder of Yum brands," which owns "Kentucky Fried Chicken, Taco Bell, [and] Pizza Hut." SOF ¶ 1.

[8]  Ultimately, the filing of this lawsuit prevented the Bank from being able to deliver clear title or possession to Kerry. That gave Kerry the right to terminate its agreement with the Bank, which it did on September 7, 2010. SOF ¶ 74.

holding that FHR's failure to close the Agreement of Sale by the deadline constitute a default, which gave the Bank the right to terminate the Agreement. *Id.* The Court further held that FHR was a mere holdover tenant and liable for back rent under the terms of its expired Property Lease with the Bank.[9]  *Id.*

Thereafter, FHR filed for reorganization under Chapter 11, although its case was dismissed because FHR had "no reasonable likelihood of rehabilitation." *Id.* ¶ 77. On December 12, 2010, FHR assigned its claims against the Bank and Kerry to Catahama ███████████

███████████████████████████████  *Id.* ¶ 78.

### *Plaintiff's Remaining Claims Against Kerry*

Following this Court's rulings on the Kerry defendants' motions to dismiss, plaintiff has two breach of contract claims remaining against Kerry. SOF ¶ 79. First, plaintiff claims that Kerry breached the LOI by informing the Bank "of the existence of an Letter of Intent between Kerry and FHR and of the parties' intention to consummate the contemplated transaction" and by terminating the LOI "when Kerry and FHR were still engaged in negotiations designed to lead to a definitive agreement." Second Amended Complaint ("SAC") ¶¶ 145, 147. Second, plaintiff claims that Kerry breached the MCIA by supposedly using "Confidential Information" that FHR provided to it under that agreement in connection with Kerry's attempt to purchase the Plant from the Bank. SAC ¶ 137. Plaintiff seeks unspecified millions in lost profits and other damages on the theory that Kerry's approach to the Bank caused FHR to lose the ability to purchase the Plant from the Bank and thus caused the destruction of FHR's business. SOF ¶¶ 80-82. For the reasons outlined below, Kerry is entitled to summary judgment on both of these claims.

---

[9]  FHR sought to appeal this ruling, but its appeal was dismissed as moot and the state court decision is now final. SOF ¶ 76.

## STANDARD FOR SUMMARY JUDGMENT

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (holding that summary judgment is mandated against a "party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial"). The movant bears the initial burden of demonstrating the absence of disputed material facts and its entitlement to judgment as a matter of law. *Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 589 (3d Cir. 2005). The burden then shifts to the respondent to present evidence that reveals a material fact is still in dispute. FED. R. CIV. P. 56(e)(2); *N.A.A.C.P. v. N. Hudson Reg'l Fire & Rescue*, 665 F.3d 464, 475 (3d Cir. 2011). The respondent "must present more than just 'bare assertions, conclusory allegations or suspicions' to show the existence of a genuine issue." *Podobnik*, 409 F.3d at 594 (quoting *Celotex*, 477 U.S. at 325).

## ARGUMENT

## I.    KERRY IS ENTITLED TO SUMMARY JUDGMENT ON COUNT VII.

### A.    The LOI Was Voidable Because Kerry Was Induced To Enter It By A Material Misrepresentation.

Plaintiff cannot recover for any purported breach of the LOI because Kerry entered into that agreement based on a material misrepresentation—that FHR had the right and ability to sell the Plant. Under the governing Wisconsin law,[10] that made the agreement voidable at Kerry's election. *See Bank of Sun Prairie v. Esser*, 456 N.W.2d 585, 588 (Wis. 1990). Because Kerry terminated the agreement once it learned the truth, it cannot be held liable for any purported

---

[10] Both the LOI and the MCIA provide that Wisconsin law governs. LOI ¶ 8; MCIA ¶ 9(g).

breach of the LOI. *Schnuth v. Harrison*, 171 N.W.2d 370, 377 (Wis. 1969) (when a party elects to terminate a voidable contract, "the parties are placed in the status quo as if no contract had ever been made").[11]

Wisconsin follows the general rule that a material misrepresentation makes a contract voidable, regardless of whether the party making the representation deliberately lied or simply made a mistake. As the Wisconsin Supreme Court held in *Schnuth v. Harrison*, "it would be unjust to allow one who has made false representations even innocently, to retain the fruits of a bargain induced by such representations." 171 N.W.2d at 376; *see also Dobratz v. Thomson*, 468 N.W.2d 654, 659 (Wis. 1991) ("Even if such a misrepresentation as that which occurred took place 'innocently,' it would be unjust to allow the maker of the misrepresentation to retain the fruits of a bargain induced thereby"); *First Nat'l Bank & Trust Co. of Racine v. Notte*, 293 N.W.2d 530, 537-38 (Wis. 1980); RESTATEMENT (SECOND) OF CONTRACTS § 164 cmt. b (1981) ("A representation need not be fraudulent in order to make a contract voidable . . . a non-fraudulent misrepresentation does not make the contract voidable unless it is material . . . .").

A misrepresentation is "any manifestation by words or other conduct by one person to another that, under the circumstances, amounts to an assertion not in accordance with the facts." *Schnuth v. Harrison*, 171 N.W.2d at 377. A misrepresentation is "material" if it "would be likely to affect the conduct of a reasonable man with reference to a transaction with another person." *Id.*; *see also First Nat'l Bank & Trust Co.*, 293 N.W.2d at 538 ("A misrepresentation is material if it is likely to induce a reasonable person to manifest his assent.").

Here, there is no doubt that Kerry was induced to enter into the LOI by FHR's material misrepresentations about its ownership of the Plant and its ability to sell it to Kerry. SOF ¶ 28.

---

[11]   Out of an abundance of caution, the Kerry defendants have moved for leave to amend their Answer to include affirmative defenses of fraud in the inducement and material mistake. *See* Dkt. 155. The Court has not yet ruled on that motion.

The first time that a Kerry representative met one of FHR's principals, he said that FHR had "acquired" the Plant out of bankruptcy. Subsequently, during Kerry's co-packing due diligence, FHR gave Kerry a document that falsely represented that "[t]he Fresh Harvest River company, with the operating plant located in DuBois, PA, is the result of the formation of a new company as a result of the ***purchase of this facility*** in May of 2009." *Id.* ¶ 14 (emphasis added). When Kerry approached FHR about potentially buying the Plant in March 2010, FHR's principals did not take that opportunity to disclose the true state of affairs. *Id.* ¶ 31. Instead, as Grillo has admitted, he "told Kerry we had the absolute right to sell the plant to them." *Id.* Grillo made that statement even though he admits that he understood that the ownership of the Plant was a critical fact that any prospective buyer would want to know. *Id.* ¶ 40.

Indeed, simply by agreeing to the draft LOI Kerry tendered to it, FHR implicitly represented that it owned the Plant or at least had an absolute right to sell it to Kerry. The terms of the LOI clearly assumed that FHR already owned the Plant and would be able to convey clear title. *See* LOI ¶ 1. That is apparent from, among other things, the fact that Kerry asked FHR for

an ████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████ *Id.* ¶ 5. By making such a promise, FHR was necessarily representing to Kerry that it owned the Plant or had the absolute right to sell it to Kerry, without any need to negotiate with any other person.

The parties' behavior after the LOI was signed provides further support for the conclusion that Kerry was induced to enter into that agreement by a material misrepresentation about FHR's right to sell the Plant to it. As noted above, a Kerry representative sent an email during the due diligence process stating his assumption that FHR held the title to the property,

but asking for confirmation of that fact. SOF ¶ 40. That Kerry moved swiftly to terminate the LOI once it discovered the truth also supports the conclusion that it was induced to enter into the LOI based on a material misrepresentation. *Id.* ¶¶ 60-62.

There is no doubt that FHR never owned either the Property or the Equipment. FHR's principals may claim that they ***thought*** they had a right to buy the Property and Equipment from the Bank. But whether or not they deliberately lied is beside the point. By April 14, 2010, when it signed the LOI, FHR had no right to buy the Property. Contrary to FHR's representations, it never had a lease with an option to buy the Property. *Id.* ¶ 7. And FHR had defaulted on the Agreement for Sale of the Property by not closing on that Agreement by the October 30, 2009 deadline. *Id.* ¶¶ 11-12. Furthermore, FHR knew that if it wanted to buy the Property and Equipment from the Bank in order to sell it to Kerry, it would need to renegotiate the price, since under the Agreement of Sale and its option to purchase under the Equipment Lease, FHR would have been required to pay the Bank $4 million ***more*** than Kerry was offering to pay.[12] *Id.* ¶¶ 9, 11. Given these indisputable facts, the only conclusion a reasonable jury could reach is that Grillo's assertion that FHR had an "absolute right" to sell the Plant to Kerry was a material misrepresentation.

As the Wisconsin Supreme Court has held, it would be "unjust" to allow FHR "to retain the fruits of a bargain" induced by FHR's misrepresentations about its right to sell the Plant to Kerry by allowing it to sue for alleged breaches of the LOI. That is particularly true given the nature of the alleged breaches—disclosing the LOI to the true owner of the property and terminating the LOI once Kerry learned the truth. The reason why Kerry disclosed the LOI

---

[12] In fact, two of FHR's principals tried to negotiate a lower price with the Bank before the LOI was terminated (SOF ¶¶ 41, 56), even though those negotiations appear, on their face, to have been in violation of the LOI's ███████████████████████████████████████████ (LOI ¶ 5).

(assuming it did so) and terminated the agreement was that it discovered that FHR's representations about its ownership of and ability to sell the Plant were not true. Under these circumstances, it would be fundamentally unjust to hold Kerry liable for breaching the LOI.

**B.      FHR Itself Disclosed The Existence Of The LOI Prior To Kerry's Alleged Disclosure.**

Whether or not the LOI was voidable, Kerry cannot be held liable for breaching the LOI by disclosing its existence to the Bank because the undisputed evidence shows that FHR itself first disclosed the LOI to the Bank.[13] *If* Kerry told the Bank about the LOI, it did so on May 26, right before it terminated the LOI. SOF ¶ 60. But FHR's CEO, Jack Gray, testified that "[a] day or two before [Kerry terminated the LOI on May 26], three days before, somewhere in [there]," he had a phone conversation with Bank officer Hepler in which he disclosed the LOI. *Id.* ¶ 57. That phone call came in the wake of the $18.5 million offer Gray and Grillo had made for the Property and Equipment through their newly-formed entity (Creative Foods) on May 19. *Id.* ¶ 56. The Bank knew at that point that Gray and Grillo did not have the funds necessary to make such a purchase and so the Bank officer asked "who [Gray's] kind of investor was." *Id.* ¶ 57. Gray testified that he not only identified Kerry as the possible investor, but also told Hepler about the Letter of Intent and "the draft of the contract" that FHR had received from Kerry on April 30. *Id.*

The 

LOI ¶ 6. Kerry was also permitted to disclose

---

[13] Kerry concedes that there is a question of fact as to whether it made such a disclosure and therefore we assume, for purposes of this motion only, that there was such a disclosure.

████████████████████████████████████████████████████

*Id.* The Kerry-drafted LOI said nothing about disclosing the LOI to the true owner of the Plant, because Kerry thought FHR owned it. Assuming that FHR was abiding by its obligations under the LOI, FHR or its principals must have decided that the Bank had a need to know about Kerry's proposal. Having made that determination, FHR should not be permitted to argue now that it was a breach of the LOI for Kerry to make the same disclosure to the Bank.

In any event, if it was a breach of the ████████████████ to tell the Bank about the LOI, then ***both*** parties were breaching the LOI. "It is well established that a material breach by one party may excuse subsequent performance by the other." *Mgmt. Computer Servs., Inc. v. Hawkins, Ash, Baptie & Co.*, 557 N.W.2d 67, 77 (Wis. 1996) (citing *Metro. Sewerage Comm'n v. R.W. Constr.*, 241 N.W.2d 371, 383 (Wis. 1976); *Entzminger v. Ford Motor Co.*, 177 N.W.2d 899, 901-902 (Wis. 1970); *Shy v. Indus. Salvage Material Co.*, 58 N.W.2d 452, 456 (Wis. 1953)). Moreover, FHR cannot claim that it suffered any injury as a result of Kerry's disclosure to the Bank since FHR itself made the very same disclosure.

### C.   Kerry Was Entitled To Terminate The Letter of Intent On May 26.

Plaintiff contends that Kerry also breached the LOI by terminating it at a time when plaintiff alleges that the parties were engaged in negotiating a definitive agreement. SAC ¶ 147. The LOI provided that ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

LOI ¶ 7(b). The "Effective Date" was April 14, when FHR accepted the LOI. *See id.* ¶ 10. Thus, Kerry had the right to terminate the LOI after May 14, so long as there was ████████

████████████████████████████████████████████████████

████████████████████████████

23

No reasonable jury could conclude that Kerry and FHR ████████████████████

████████████████████████████████ on May 26, when Kerry terminated the

LOI. Indeed, there were *never* any such negotiations. Kerry sent FHR a draft PSA on April 30.

SOF ¶ 43. Over the course of the next 26 days, despite Kerry's inquiries, FHR never provided

any comments on the draft. *Id.* ¶¶ 43, 52. No meetings were ever held to discuss the terms of

the PSA. *Id.* ¶ 43. Instead, the only response Kerry ever got to its draft agreement was an email

sent by FHR's new counsel on Friday May 14 advising it that he had been engaged earlier that

week and that he was "scheduled to speak with [his new clients] again over the weekend/early

next week" and would "be in a position to discuss . . . the transaction" once he had done so. *Id.*

¶ 52. Thereafter, FHR's counsel did not contact Kerry to discuss the draft PSA. Kerry's next

contact from FHR's counsel was on May 24, when he forwarded a title commitment to Kerry

reflecting that title to the Plant was held by the Bank and represented that FHR was operating the

Plant based on a "lease with an option to purchase"—a statement that (whether the lawyer knew

it or not) was not true. *Id.* ¶ 58.

Apart from the fact that the parties were not engaged in negotiations, Kerry had an

absolute right to terminate the LOI once it discovered that FHR did not own the Plant. The LOI

provided that one of the conditions that ████████████████████████████████

████████████████████████████████████████████

████████ LOI ¶ 2(a). Kerry obviously was not ████████ to learn that FHR did not own the

Plant it was trying to sell to Kerry. That alone was enough to enable Kerry to terminate the LOI.

Kerry also had the right to terminate because FHR had materially breached its obligations

under the LOI. *See Mgmt. Computer Servs.*, 557 N.W.2d at 77. As this Court held in its October

26, 2011 opinion, a duty to act in good faith is implied into every contract under Wisconsin law.

Dkt. 100, at 10 (citing *Mkt. St. Assocs. Ltd. P'ship v. Frey*, 21 F.3d 782, 786 (7th Cir. 1994)). FHR was not acting in good faith by failing to fully and truthfully respond to Kerry's inquiries about the ownership of the Plant and by failing to disclose the Bank's May 6 and May 18 letters terminating all agreements with FHR and ordering it to vacate the Plant. SOF ¶¶ 40, 46, 53, 58.

Moreover, plaintiff now claims that FHR was not actually planning on selling the Plant to Kerry. Plaintiff cannot possibly claim that FHR was negotiating in good faith to sell the Plant to Kerry when its damages theory is that FHR was planning to keep and run the Plant itself. *Id.* ¶ 79. In addition, the undisputed facts show that two of FHR's members had formed another LLC (Creative Foods) and were negotiating a purchase of the Plant with the Bank in order to exclude FHR's third member, Abramson. *Id.* ¶¶ 41, 56. That violates the plain language of the

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███ LOI ¶ 5.

All of FHR's numerous breaches of its obligations under the LOI—some of which Kerry discovered before May 26 and some of which have only emerged in discovery—preclude FHR from claiming that Kerry breached the LOI by terminating it.

### D. Plaintiff Cannot Show That The Alleged Breaches Caused The Harm For Which It Seeks Damages.

A separate and independent reason for granting summary judgment to Kerry is that plaintiff cannot show the necessary causal link between Kerry's alleged breaches of the LOI and the harm for which plaintiff seeks damages. As noted above, plaintiff does not claim that FHR was injured by the loss of an opportunity to profit by "flipping" the Plant to Kerry after buying it

from the Bank.[14]   SOF ¶¶ 79-80.   Instead, plaintiff's theory is that by approaching the Bank

Kerry interfered with FHR's efforts to buy the Plant from the Bank *for itself*, which supposedly

deprived FHR of an opportunity to save its business and become a hugely profitable enterprise.

*Id.* ¶ 80.   Even if plaintiff could prove that Kerry breached the LOI (which it cannot), its

causation theory fails as a matter of law.

Wisconsin applies the ordinary rule that damages for breach of contract are limited to

those "'reasonably to be supposed to have been in the contemplation of both parties at the time

they made the contract as the probable result of the breach of it.'"   *Reiman Assoc., Inc. v. R/A

Adver., Inc.*, 306 N.W.2d 292, 300 (Wis. App. 1981) (quoting *Foss v. Heineman*, 128 N.W. 881,

883 (Wis. 1910)).   Here, Kerry could not possibly have anticipated that the "probable result" of a

breach of the LOI would be that FHR would be unable to buy the Plant and continue operating

its business.   After all, Kerry reasonably believed that FHR already owned or at the very least

had an absolute right to buy the Plant and re-sell it to Kerry.   *See* SOF ¶¶ 28, 40, 51, 58.   So it

could not have known, when it entered into the LOI, that any breach of the LOI might interfere

with FHR's efforts to persuade the Bank to sell the Plant to FHR.

Furthermore, it could not possibly have been within the contemplation of the parties that

FHR would be injured by a breach of the LOI because FHR would be unable to *keep* the Plant

and operate itself.   The whole point of the LOI was to explore a transaction in which FHR would

cease conducting business at the Plant and would sell the Plant to Kerry.   Kerry could not

possibly have understood when it entered into the LOI that FHR's real intention was to negotiate

with the Bank to buy the Plant at a price that was lower than the $26 million FHR had previously

---

[14] That theory would have faced a variety of insurmountable hurdles, not the least of which would have
been proving that FHR could have purchased the Plant from the Bank despite the fact that it had no
money to do so.   SOF ¶¶ 12, 82.   Although Creative Foods and Catahama both made offers to the Bank
(*id.* ¶¶ 56, 66, 69), it would have been nonsensical for them to contribute the Plant to the debt-ridden FHR
so that FHR could re-sell the Plant for a few million dollars more to Kerry.

agreed to pay and then *not* sell it to Kerry.  Thus, Kerry cannot be liable if its alleged breaches of the LOI precluded FHR from succeeding on such a plan.

Plaintiff's causation theory also fails because it cannot show that any claimed breach of the LOI proximately caused the harm for which plaintiff seeks damages.  Damages are an essential element of a claim for breach of contract under Wisconsin law.  *Brew City Redevelopment Grp., LLC v. The Ferchill Grp.*, 714 N.W.2d 582, 588 (Wis. App. 2006) (citing *Nw. Motor Car, Inc. v. Pope*, 187 N.W.2d 200, 203 (1971)); *Cent. Brown Cnty. Water Auth. v. Consoer, Townsend, Envirodyne*, No. 09-C-0131, 2013 WL 501419, *5-7 (E.D. Wis. Feb. 11, 2013) (surveying Wisconsin case law on nominal contract damages and concluding that "[i]t would be patently unreasonable to allow [suits] for breach of contract . . . if the only damages that could possibly be assessed are nominal damages.").[15]   Plaintiff must be able to prove that Kerry's alleged breach of contract proximately caused FHR's purported damages.  2 RUSSELL M. WARE, THE LAW OF DAMAGES IN WISCONSIN § 26.4 (2d ed. 1995); *see also Wis. Knife Works v. Nat'l Metal Crafters*, 781 F.2d 1280, 1289 (7th Cir. 1986) (Posner, J.) ("As in tort law, so in contract law, causation is an essential element of liability.  If the damage of which the promisee complains would not have been avoided by the promisor's not breaking his promise, the breach cannot give rise to damages." (citations omitted)).

---

[15] Nominal damages are normally never sufficient to maintain a suit for breach of contract but a 50-year-old opinion by the Wisconsin Supreme Court has occasionally been mischaracterized by plaintiffs attempting to do so.  In *Vasselos v. Greek Orthodox Cmty. Of St. SPyridan*, 129 N.W.2d 243 (Wis. 1964), the court held that a jury could find that a defendant had breached a contract yet award only nominal damages in the event that plaintiff failed to prove it had suffered any actual damages.  *Id.* at 245.  As the court in *Central Brown County Water Authority* observed, *Vasselos* does not hold, "however, that a party is entitled to a trial on a claim that from the outset can support a verdict for no more than nominal damages."  2013 WL 501419, at *6.  Wisconsin courts have consistently held that "a plaintiff must prove damages to go to trial on a breach of contract claim.  *Id.* at *7 (citing *Matthews v. Wis. Energy Corp.*, 534 F.3d 547, 557 (7th Cir. 2008); *Brew City Redevelopment Grp.*, 714 N.W.2d at 588 (Wis. App. 2006); *Black v. St. Bernadette Congregation of Appleton*, 360 N.W.2d 550, 553-54 (Wis. App. 1984)).

FHR's harm, if any, was not caused by Kerry's disclosure of the LOI to the Bank or Kerry's termination of the LOI. Even under plaintiff's theory, FHR's "harm" was caused by the fact that Kerry offered a higher price to the real owner of the Plant than FHR (or Creative Foods or Catahama) was willing or able to pay. *See id.* ¶ 80. But Kerry had no duty under the LOI to refrain from trying to buy the Plant from its real owner. The ████████████ bound only FHR and its members—not Kerry. *See* LOI ¶ 5. This Court has already held that "Kerry had no independent duty under public policy to refrain from purchasing the Premises directly from the Bank—particularly after Kerry learned that the Bank was the rightful owner." Dkt. 100, at 11. If FHR's intent was in fact to buy the Plant and keep operating it, it failed to do so not because Kerry breached any obligations under the LOI but rather because FHR lacked the resources to buy the Plant from the Bank. *See* SOF ¶¶ 12, 82; *see also infra* at 34-37.

## II.   KERRY IS ENTITLED TO SUMMARY JUDGMENT ON COUNT VI.

Kerry also is entitled to summary judgment on Count VI (breach of the MCIA). Plaintiff asserts that Kerry breached the MCIA by "misus[ing] and exploit[ing]" confidential co-packing information disclosed by FHR, "to negotiate a purchase of the [Plant] from the Bank and, when it learned that it could make a separate deal with the Bank at a lower price, used that information to the detriment of FHR." SAC ¶ 137. In order to sustain such a claim, plaintiff would have to identify specific information it supplied to Kerry pursuant to the MCIA (i) ████████████ ████████████████ (ii) ████████████████ ████████████ (iii) ████████ ████████████████████████████ and (iv) that proximately caused damages to FHR. For the reasons outlined below, plaintiff cannot meet that burden.

**A.     None Of The Information Disclosed By FHR Is Subject To The MCIA Because It Was Not Marked Or Designated As Confidential.**

The MCIA ███████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████ MCIA ¶ 1(a).  The purpose of the form MCIA, which Kerry asked FHR to sign, was to protect formulas and other confidential information that Kerry and its customers would supply to FHR to enable it to manufacture products for them.  SOF ¶ 24.  That conclusion is supported by ████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████ MCIA ¶ 1(b).

Importantly, the MCIA sought to avoid future disputes about ████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

As used in the MCIA, ████████████████████████████████████████

████████████████████████████████  *See Armstrong v. Colletti*, 276 N.W.2d 364, 366-67 (Wis. App. 1979) (construing "shall" in a contract as "mandatory language"); *see also*

*Geiger v. Hanneman*, 801 N.W.2d 350 (table), 2011 WI App 114, ¶ 14 (same); *see also Den-Tal-Ez, Inc. v. Siemens Capital Corp.*, 566 A.2d 1214, 1223 (Pa. Super. 1989) (holding the "usage of mandatory terms such as 'shall', 'will', and 'must'" "clearly indicates" that stamping is mandatory in confidential information agreement).

Kerry is entitled to summary judgment on plaintiff's claim under the MCIA for the simple reason that the undisputed facts show that FHR never designated any information it provided as "Confidential Information" under the MCIA. FHR never stamped any written information it provided to Kerry relating to contract manufacturing as "confidential." Nor did FHR ever send a writing to Kerry designating as confidential any visual or oral information it had previously provided, as the MCIA expressly required. SOF ¶ 26. The parties' document production contains no such writings. Kerry employees testified that they never received any such writings from FHR, and Grillo and Gray admitted that none were ever sent. *Id.* FHR's failure to designate is fatal to plaintiff's claim that Kerry breached the MCIA. When FHR failed to designate any information as "Confidential," Kerry had the right to assume that *none* of the information FHR gave it relating to contract manufacturing was subject to the limitations set forth in the MCIA and that Kerry was therefore free to use that information for other purposes.

That interpretation was strengthened by the fact that FHR did not complain that Kerry had breached the MCIA when Kerry invited it to discuss a potential sale or when Kerry tendered an LOI contemplating a ▮▮▮▮▮▮▮▮▮▮▮▮ for the Plant. Furthermore, FHR signed the LOI in which it agreed ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See* LOI. FHR then
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

███████     *Id.* ¶¶ 37-38. The only reasonable inference that can be drawn from FHR's conduct is that it did not consider information such as the layout of its Plant, the equipment inside, or the manner in which it was operated to be confidential at the time the information was supplied. Instead, plaintiff's claim for breach of the MCIA is clearly an after-the-fact invention that FHR and then Catahama grabbed hold of in the hope of finding some claim that might stick against Kerry.

### B.   Plaintiff Cannot Show That The Information Kerry Relied On During Its Negotiations With The Bank Was Protected By The MCIA.

The Court noted in its October 26, 2011 opinion that "Plaintiff may be hard-pressed to prove causation, i.e., that Kerry, in fact, misused confidential information obtained pursuant to the Confidentiality Agreement in its negotiations with the Bank." Dkt. 100, at 8. Discovery has confirmed that prediction. There is, for example, no evidence that Kerry ever gave anything that could be deemed "Confidential Information" under the MCIA to the Bank. Thus, plaintiff's theory is apparently that Kerry used its knowledge of "Confidential Information" in deciding that it wanted to buy the Plant and in formulating the price it was willing to pay. To prove such a claim, however, plaintiff would first have to identify specific information that was properly marked "Confidential" in accordance with the MCIA and that Kerry obtained *solely* in connection with the ████████████████████████████████—after the MCIA was signed. Then plaintiff would have to show that Kerry "used" this information in formulating its negotiating strategy with the Bank and that Kerry would not have reached the same conclusions absent that information. For a variety of reasons, plaintiff cannot possibly meet this burden.

First, even if plaintiff could get beyond FHR's failure to designate any information as "Confidential" as required by the MCIA, it would have to show that the information was

31

supplied during the narrow period of time in which the parties were discussing a co-packing arrangement.  The Confidentiality Agreement was ████████████████████████████ of the agreement, March 5, 2010, so that any information disclosed before that date, during Kerry's initial 2009 visit to the Plant, cannot be Confidential Information.  MCIA ¶ 7.

Second, plaintiff cannot rely on any information that FHR disclosed to Kerry in connection with Kerry's interest in purchasing the Plant and in response to Kerry's due diligence requests after the LOI was signed.  Such information falls outside the scope of the MCIA because it was ██████████████████████████████████████████████████ ███████████████████████ MCIA ¶ 1(a).  Because FHR did *not* obtain (or even ask for) a confidentiality clause in the LOI, Kerry was free to use anything FHR supplied to it during the due diligence process for any purpose—and certainly was free to use it to decide whether it wanted to continue to pursue a purchase of the Plant and, if so, whether the $22 million initial price it had offered was appropriate.  Indeed, that was the very purpose for which FHR supplied information in response to Kerry's due diligence requests.  *See* SOF ¶¶ 36-38, 54, 58.

FHR supplied Kerry with a wealth of information about the Plant in response to Kerry's comprehensive due diligence questionnaire (sent a week after FHR executed the LOI) and several other written requests for information.  *See id.* ¶ 36.  For example, Grillo provided Kerry with information about the Plant's layout and Equipment, including detailed computer-aided design or "CAD" files, FHR also allowed Kerry personnel and appraisers to come into the Plant to value the Property and Equipment.  *Id.* ¶ 37   Some of this information may have been provided to Kerry in some form during the initial discussions regarding contract manufacturing.  But the fact that FHR supplied the information again and in greater detail during the due diligence period would preclude plaintiff from claiming that any of it was covered by the MCIA

even if it had been designated "Confidential" (which it was not). Once FHR freely provided information to Kerry for the purpose of evaluating an acquisition of the Plant, it necessarily waived any claim it could have made that the information had been supplied in connection with contract manufacturing negotiations and could not be used for any other purpose.

Third, even if plaintiff could identify some information that was marked "Confidential," was supplied *only* in connection with contract manufacturing discussions and was not reiterated during due diligence, plaintiff would still have to show that the information was not already known to Kerry at the time it was received or in the public domain. The Court has already observed that "[t]he Second Amended Complaint acknowledges that Kerry is active in the industry." Dkt. 100, at 8. Considering that even Feinberg has admitted that what he saw and learned during his own visit to the Plant "was not any kinds of information that was confidential" because it was all "stuff [he] knew" (SOF ¶ 18), it is hard to see how plaintiff could claim that any information FHR disclosed to Kerry was protected under the MCIA.

Much of the information Kerry relied on in analyzing the Plant came from Kerry's own knowledge of the industry  For example, nearly all of Kerry's analyses of its costs, including raw material and shipping costs, were based on its own institutional knowledge and independent research. *Id.* ¶ 39. For example, ███████████████████████████████████ ███████████████████████████████████████ ███████████████████████████████████████ ███████████████████████████████████. Similarly, Kerry was not interested in the few customer contracts that FHR had and the highly unprofitable business it was

33

doing in the Plant; instead, Kerry's analysis concentrated on what it could do with the Plant based on its own customer relationships. *Id.*[16]

Finally, to prevail on its claim for breach of the MCIA, plaintiff would also have to show that Kerry actually *used* the "Confidential Information" in negotiations with the Bank. Plaintiff also cannot meet that burden. Kerry orally offered the Bank ███████ for the facility on May 28, 2010 and confirmed the offer in writing on June 10, 2010. *Id.* ¶ 67. The evidence is undisputed that Kerry based its May 28 offer on a selection of comparable properties it obtained from third parties, including real estate broker Counsell. *Id.* On June 9, Kerry received the ██████████████████████████████████████████████ the appraisers valued the Property at ██████████ and the Equipment at ██████████ *Id.* These appraisals were based on information obtained in post-LOI due diligence and *not* on any "Confidential Information" Kerry had received as part of its earlier contract manufacturing discussions with FHR. *Id.* ¶ 38. In light of the total appraised value of approximately ██████████, Kerry confirmed its ██████████ offer in writing.[17] *Id.* ¶¶ 67-68.

Kerry raised its offer to $20 million only after the Bank told it that it was competing against another bidder that had made a "substantially" higher offer. *Id.* ¶ 68. Based on information that Counsell had provided in early May, Kerry had reason to believe that the other offer was in the ██████████████████████ *See id.* ¶ 47. Thus, Kerry's decision to raise its offer was based on the rumors it had heard about its competition, rather than any "Confidential Information" it had obtained under the MCIA.

---

[16]  Kerry offered a letter of intent for the assets it assumed FHR owned, rather than trying to buy FHR, because it understood that FHR was not running a profitable business. *See, e.g.*, LOI at 1; SOF ¶ 39

[17]  Kerry provided copies of the comparables it had obtained to the Bank to try to persuade it that Kerry's ██████████ proposal was reasonable. SOF ¶ 67.

Because plaintiff cannot meet its burden of proving that Kerry breached any obligation it owed under the MCIA, Kerry is entitled to summary judgment on that claim as well.

### C.   Plaintiff Cannot Show That FHR Suffered Any Harm That Was Proximately Caused By A Breach Of The MCIA.

Yet another reason for granting summary judgment in favor of Kerry on Count VI is that plaintiff cannot carry its burden of showing that any arguable breach of the MCIA proximately caused FHR to lose the opportunity to buy the Plant and in so doing somehow cure its ailing business.

Even if plaintiff could show that Kerry breached the MCIA (which it cannot), it cannot show that such a breach caused FHR to lose the opportunity to buy the Plant from the Bank. As the Court held in its October 26, 2011 Order, "[t]he MCIA did not bar Kerry from contacting the Bank or from attempting a direct purchase of the Premises." Dkt. 100, at 8. Yet it is Kerry's contact with the Bank that plaintiff claims led to FHR's inability to buy the Plant from the Bank. SOF ¶ 81. Plaintiff cannot show that Kerry would not have contacted the Bank absent the alleged breach of the MCIA. Plaintiff may argue that but for the "Confidential Information" Kerry supposedly learned during its initial visits to the Plant Kerry would not have decided to try to purchase the Plant, would not have entered into the LOI and then would not have continued to try to pursue the purchase after it discovered that the Bank was the true owner. Plaintiff does argue that, absent Kerry's approach, FHR would have bought the Plant and FHR would have somehow turned its business around and become profitable. But this is far too speculative a chain of causation to support a claim for breach of contract. As Justice Scalia once observed, "[l]ife is too short to pursue every human act to its most remote consequences; 'for want of a nail, a kingdom was lost' is a commentary on fate, not the statement of a major cause of action

35

against a blacksmith." *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 287 (1992) (Scalia, J., concurring in judgment).

Furthermore, even if plaintiff could show that Kerry would not have approached the Bank absent the alleged MCIA breach, it still would not be able to prove causation because there is no evidence that FHR would have been able to buy the Plant from the Bank if Kerry had not made that approach. FHR admitted in depositions that "[w]hatever harm was caused . . . by its inability to buy the property was caused by the fact that [FHR] had zero funds with which to purchase the property." *Id.* ¶ 82. FHR had been running at a huge deficit since it started operations ($160,000 a month) and continued to do so until it ceased doing business. *Id.* ¶¶ 17, 19-21. FHR was unable to come up with $2.5 million to buy the Property by the October 2009 deadline set forth in the Agreement of Sale. *Id.* ¶ 12. And there is not a shred of evidence that FHR even *attempted* to purchase the Plant in 2010. In fact, FHR witnesses admitted that the Bank said it would not sell the Plant to FHR because of Mr. Abramson's involvement in FHR. *Id.* ¶ 41; *see also* SAC ¶¶ 53, 55. Since FHR could not have acquired the Plant, there is no even arguable causal link between Kerry's alleged breaches and FHR's claimed loss of the Plant and of its business.

Indeed, the very fact that two of FHR's members formed another LLC to try to buy the Plant and that Catahama also attempted a purchase demonstrates that *FHR* was not injured by the fact that Kerry approached the Bank about buying the Plant. Creative Foods' offer failed before Kerry's alleged breach. SOF ¶ 56. But even if Creative Foods could have bought the Plant (and there is no evidence that that was a real possibility), how would that have enabled FHR to obtain the Plant or to turn its business around? The same is true of Catahama. Feinberg

36

wanted to buy the Plant for his own company (*id.* ¶¶ 66, 79); that Kerry outbid him does not provide a basis for a claim that Kerry injured FHR.

Furthermore, as plaintiff and FHR admitted in their 30(b)(6) depositions, FHR failed because of the Bank's actions and FHR's own insolvency, which had nothing to do with Kerry's actions. *Cf. Dynegy Mktg. & Trade v. Multiut Corp.*, 648 F.3d 506, 521 (7th Cir. 2011) (holding breach of contract claim failed under Illinois law where plaintiff presented no evidence that alleged breach of confidentiality agreement had caused business to fail and had admitted that "numerous other factors" had contributed). Before Kerry ever approached the Bank, the Bank had notified FHR that it was terminating the 2009 Agreement of Sale and the Property Lease, terminated the Equipment Lease, accelerated its credit lines and ordered it to vacate the Plant by May 31   SOF ¶¶ 44-45, 53. That put in motion the events that ultimately led to FHR's failure, as the Bank followed through on the exercise of its creditor rights, including notifying FHR's customers to remit payments directly to the Bank and moving to evict FHR when it refused to vacate the premises voluntarily. *Id.* ¶ 73. Three courts, including this one, have held that the Bank's actions were authorized. *See* Dkt. 84, at 11-16; SOF ¶¶ 76-77. It was those actions that caused FHR's failure—not Kerry's entirely lawful action in approaching the true owner of the Plant once it discovered the truth.

## III.   KERRY GROUP IS ENTITLED TO SUMMARY JUDGMENT BECAUSE IT IS NOT A PARTY TO EITHER CONTRACT.

Plaintiff asserts that Kerry Group should also be held liable for Kerry's alleged breach of the MCIA and Letter of Intent. But Kerry Group was not a party to either agreement and thus must be dismissed from the case no matter how the Court rules on Kerry's motion.

It is hornbook law that "one cannot enforce a contract against an entity that is not a party to it." *Maciolek v. City of Milwaukee Employees' Ret. Sys. Annuity & Pension Bd.*, 709 N.W.2d

360, 368 (Wis. 2006).   "[O]rdinarily, a stockholder is not liable on contracts entered . . . even where the stockholder is the parent corporation and owns all the outstanding shares of the subsidiary that entered into the contract."   *Posyniak v. Sch. Sisters of St. Francis of St. Joseph's Convent*, 511 N.W.2d 300, 308 (Wis. App. 1993).   Here, it is undisputed that the only parties to the Confidentiality Agreement were Kerry and FHR (MCIA at 1, 3) and that the only parties to the Letter of Intent were also Kerry and FHR (LOI at 1, 4).   Accordingly, Kerry Group is entitled to summary judgment on all claims against it as a matter of law.

## CONCLUSION

The undisputed facts show that Kerry did not breach any agreement with FHR.   On the contrary, it is FHR that consistently misled Kerry and breached its obligations under the Letter of Intent.   Furthermore, there is no theory under which Kerry could be held liable for the failure of FHR's business.   After nineteen months of discovery, plaintiff has found nothing to support its claims, and thus it is time for this case to end.

For the foregoing reasons, the Kerry defendants respectfully request that this Court grant summary judgment in favor of the Kerry defendants and against plaintiff on Counts VI and VII of the Second Amended Complaint.

38

Dated:  September 26, 2013

Respectfully submitted,

/s/ Mark A. Willard
_____
Mark A. Willard, Esquire (Pa. No. 18103)
Amy J. Roy, Esquire (Pa. No. 86584)
ECKERT SEAMANS CHERIN & MELLOTT, LLC
600 Grant Street, 44th Floor
Pittsburgh, PA 15219
Phone: (412) 566-6000
Fax: (412) 566-6099
Email: mwillard@eckertseamans.com
Email:  aroy@eckertseamans.com

Michael R. Feagley, Esquire (*pro hac vice*)
Emily M. Emerson, Esquire (*pro hac vice*)
Joshua A. Faucette, Esquire (*pro hac vice*)
Charles M. Woodworth, Esquire (*pro hac vice*)
MAYER BROWN LLP
71 South Wacker Drive
Chicago, Illinois 60606
Phone: (312) 782-0600
Fax: (312) 701-7711
Email: mfeagley@mayerbrown.com
Email: eemerson@mayerbrown.com
Email: jfaucette@mayerbrown.com
Email: cwoodworth@mayerbrown.com

*Attorneys for Kerry Inc. and
Kerry Group plc*

39

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing Memorandum in Support of

Defendants' Motion for Summary Judgment has been served via overnight delivery and the

CM/ECF system upon the following counsel this 26th day of September, 2013:

Kevin K. Douglass, Esquire
Babst, Calland, Clements and Zomnir, P.C.
Two Gateway Center, 7th Floor
Pittsburgh, PA 15222

Jason Levin, Esquire
Steven G. Storch, Esquire
Matthew Kane, Esquire
Storch, Amini & Munves, PC
2 Grand Central Tower
140 East 45th Street, 25th Floor
New York, NY 10017

/s/ Mark A. Willard